SHREVE ET AL., APPELLANTS, *v.* COPPER BELL MINING COMPANY, RESPONDENT.

[Argued October 19, 1891. Decided December 14, 1891.]

MINES AND MINING—*Estoppel by deed.*— Where the owners of a mining claim, prior to conveying by separate deeds all their right, title, and interest therein to the defendant, had changed the boundaries so that a portion thereof conflicted with an adjoining claim to which they afterwards acquired title, they cannot thereafter be heard to assert any claim to the area in conflict, as their deeds to the defendant must be construed to convey the claim as its boundaries were known to them at the date of their conveyances, and thereby an estoppel is created between the parties and their privies which is binding upon such after-acquired title. (DE WITT, J., dissenting.)

SAME—*Location—Discovery—" Valuable" mineral deposit interpreted.*—Under section 2319 of the Revised Statutes of the United States, opening to exploration and purchase all valuable mineral deposits in lands belonging to the United States, and section 1477, fifth division of the Compiled Statutes, requiring the discovery on the lode of a vein of quartz or ore with at least one well-defined wall, as a condition precedent to recording the notice, it is not essential to the validity of the location of a mining claim that the discoverer should have found, prior to his location thereof, that the lode contained mineral deposits of sufficient value to justify work to extract them; but the spirit of the statutes is satisfied by the discovery of mineral deposits of such value as to at least justify the exploration of the lode in expectation of finding ore sufficiently valuable to work. (*Davis* v. *Weibbold,* 7 Mont. 107; S. C. 139 U. S. 507, reviewed and distinguished.)

*Appeal from Fifth Judicial District, Jefferson County.*

Action to determine the right to the possession of mining premises. The cause was tried before GALBRAITH, J. Defendant had judgment below.

*McConnell & Clayberg,* for Appellants.

I. The court found that the grantors of the plaintiffs did everything necessary to make a valid location of the Lightning Lode, except that they failed to make a valid discovery of a mineral-bearing vein or lode before making their location; and upon this point the court found as follows: "That prior to the time of location, by posting the notice and marking the boundaries of the said Lightning Mining Claim, there had not been any actual discovery of any vein or lode containing rock in place, or any rock, bearing any *known* mineral deposits of sufficient value to justify expenditure in the effort to extract them." And again, that they "did not know by assay or otherwise, prior to the location by them of the surface ground, that this rock (found in the discovery) did actually contain any mineral of sufficient richness to justify work to extract it." The court also found as a conclusion of law: "That the Lightning Claim and location is invalid, and of no force, for the absence of a discovery of any vein or lode containing rock bearing *known* mineral deposits of such richness as to justify work to extract them at or prior to the location of the surface ground of said claim."

The foregoing findings were duly assigned as errors. The court adopted a false standard as to the requirements of the law of Congress in regard to what constitutes a discovery of a vein or lode containing valuable mineral deposits. The standard of the court is that the "mineral deposits" must be "of sufficient richness to justify work to extract them," and in keeping with this erroneous standard, he found that the mineral-bearing rock which was discovered by the locators of the Lightning Lode did not contain "any mineral of such sufficient richness to justify work to extract it." The meaning of the term "mineral vein, lode, or ledge," as found in section 2319 of the Revised Statutes of the United States, has been repeatedly defined by the courts; and it is the discovery of the mineral vein, lode, or

ledge spoken of in this section that must be made before the location can be lawfully made; and the question in this case is whether the discovery upon a mineral vein, lode, or ledge must be of "such richness as to justify work in extracting it," before a valid location can be made.  The court below held that it was; and in this we respectfully but earnestly submit that there was error; that to hold such a doctrine would be to destroy the title of nine tenths of the quartz mining properties that are now being worked in the State of Montana.  All experience teaches us that to find pay ore at or near the surface of the ground is the exception; and that the general rule is, that pay ore is not found except at considerable depths in the earth, and can only be reached after a great deal of labor and the expenditure of much money; and that it is an unreasonable construction of the foregoing acts of Congress to hold that ore must be found of "such richness" as that it will pay to extract it before a location can be made, because until the locator is certain of his title he cannot afford such a great outlay of labor and treasure.

The following definition has the unqualified approval of the Supreme Court of the United States, to wit: "To determine whether a lode or vein exists it is necessary to define those terms; and as to that it is enough to say, that a lode or vein is a body of mineral or mineral-bearing rock, within defined boundaries in the general mass of the mountain."  In this definition the elements are "a body of mineral or mineral-bearing rock and the boundaries; with either of these things well established, very slight evidence may be accepted as to the existence of the other.  A body of mineral or mineral-bearing rock in the general mass of the mountain, so far as it may continue unbroken and without interruption, may be regarded as a lode, whatever the boundaries may be.  In the existence of such body, and to the extent of it, boundaries are implied.  On the other hand, with well defined boundaries, very slight evidence of ore within such boundaries will prove the existence of a lode.  Such boundaries constitute a fissure, and if in such fissure ore is found, although at considerable intervals and in small quantities, it is called a lode or vein."  (*Iron Silver Min. Co.* v. *Cheesman,* 116 U. S. 529–538.  See, also, *Stevens* v. *Gill,* 1 Morr.

Min. Rep. 579; *Eureka Min. Co.* v. *Richmond Min. Co.* 9
Morr. Min. Rep. 587; *Jupiter Min. Co.* v. *Bodie Con. Min. Co.*
11 Fed. Rep. 675; *Harrington* v. *Chambers*, 3 Utah, 94; *North
Noonday Co.* v. *Orient Co.* 9 Morr. Min. Rep. 387; *Hyman* v.
*Wheeler*, 1 Morr. Min. Rep. 558, 559, 560; *Foote* v. *National
Min. Co.* 2 Mont. 402; *Chambers* v. *Harrington*, 111 U. S. 350.)
There can be no doubt but that the court would have found that
there was a genuine legal discovery made upon the Lightning
vein if it had not been for the false standard which he took as
to what the law was; that is, the locators must find a lead of
such richness in precious metals as to justify labor in extracting
them.

Counsel for the respondent relied in the court below upon
the case of *Deffeback* v. *Hawke*, 115 U. S. 392.    That case had
reference solely to a placer claim; and there was no contention
upon this subject, so that what the court said in regard to it
does not amount to any authoritative decision, and even if it
was, it might be perfectly true in regard to a placer claim; but
we submit that the rule is wholly different when referring to
quartz mines.    As having a bearing upon the case of *Deffeback*
v. *Hawke*, we refer the court to the *Colorado Coal Co.* v. *United
States*, 123 U. S. 327, and also *Francoeur* v. *Newhouse*, 40 Fed.
Rep. 622.    These cases do not in any manner affect the ques-
tion as to what constitutes a vein, lode, or ledge, as given in
authorities heretofore referred to.    The mining laws are to be
liberally construed.    (*Robertson* v. *Smith*, 1 Mont. 410; *Upton*
v. *Larkin*, 7 Mont. 449.)    The testimony of assays made after
discovery are to be considered in determining whether a genuine
discovery has been made or not.    (*Southern Cross Co.* v. *Europa
Co.* 15 Nev. 385.)

II.    The court finds as a conclusion of law that the plaint-
iffs are estopped by the deeds of Nelson and Koegel from assert-
ing title to any part of the ground embraced in the Edna Lode,
as was marked off and designated on the seventeenth day of
August, 1889, and prior thereto.    This is duly assigned as
error by the appellants.    (a) The respondent introduced a
deed from Charles Koegel to Riggs and Bradley, dated the
seventeenth day of August, 1889, in which he conveys to them
"an undivided one-fourth interest in and to that certain piece

or parcel of land known as the Edna Quartz Lode Mining
Claim, situated in Cataract unorganized mining district, Jeffer-
son County, Montana Territory. Said Edna Lode is fully
described in the notice of location thereof which is recorded in
the office of the county clerk and recorder of Jefferson County,
Montana." No evidence was offered to explain this convey-
ance, and indeed none could have been lawfully offered, because
it is plain and unambiguous and needs no explanation. It
is axiomatic that in a deed, words of general description are
limited by those of particular description. And it is further-
more an uncontroverted proposition of law, where in a descrip-
tion of a deed reference is made to another deed or writing for
boundaries, that such description may be looked to, and have
the same effect upon the description as if the descriptions con-
tained in such paper referred to were themselves incorporated
in the deed. Koegel in his deed refers to the location notice,
and says that the Edna Lode which he was conveying on the
17th of August, 1889, was fully described therein. How can
it be said, then, that he conveyed any portion of the land in dis-
pute which was wholly unconnected with the Edna Lode until
the effort was made to change the lines of the Edna Lode on
the 13th of May, 1889? So on the 15th of June, 1887, when
this description was made, and the very identical description
of the very identical piece of land, an undivided one-fourth
interest in which Koegel is conveying by his deed was marked
out upon the ground. It seems to us that it is too absurd for
argument to insist that there is any estoppel on Koegel and
those who hold under him by reason of this deed. The con-
tention that the appellants are estopped by this deed rests upon
the provisions of section 267, fifth division of the Compiled
Statutes, providing that an after-acquired title to real estate
shall pass to the grantee where the grantor purported to convey
the fee, but at the time of the conveyance did not have the legal
estate therein. Admit, for the sake of argument, that the fact
is as found by the court, that no relocation notice was re-
corded for the Edna Lode until the nineteenth day of No-
vember, 1889, after the execution of this deed; and admit the
further fact that until this location notice was recorded, accord-
ing to the finding of the court no possessory title or right to

the land in dispute was vested in the grantors of the defendant, still, let it be admitted, that notwithstanding there was no estate whatever in Koegel and Nelson to the ground in dispute at the time their deeds were made for the want of this location notice, even upon the assumption that the Lightning Claim was void; still we insist there was no estoppel for the reason that there was no conveyance by said deeds to Bradley and Riggs of any portion of the ground in dispute. That which was the Edna Lode, as it was recorded on the 15th of June, 1887, and not as it was changed or attempted to be changed on the 13th of May, 1888, was conveyed. (*b*) In the deed of Frank Nelson to Riggs and Bradley, executed on the twenty-first day of August, 1889, he "grants, bargains, sells, remises, releases, and forever quit-claims unto the said parties of the second part, and to their heirs and assigns, all of the undivided one-fourth interest of the said party of the first part in and to the Edna Quartz Lode Claim, situate in Cataract unorganized mining district, Jefferson County, Montana Territory. This claim is recorded on page 448 of Book P of Lode Locations of Jefferson County." This is substantially the same description as given in the deed of Koegel. After describing the claim generally by its name, as the Edna Quartz Lode Claim, the deed proceeds to say: "Said claim is recorded on page 488 of Book P of Lode Locations of Jefferson County." The language of this deed is plain and unambiguous. It needs no parol testimony to show the subject to which it applies. It refers to the record notice giving the book and page, and that of itself when read shows what was conveyed. (*c*) The court, over the objection of appellants, permitted Frank Nelson to be asked what he intended to convey by this deed. This was clearly erroneous. Where the description of land in the deed is definite and certain and no latent ambiguity exists, extrinsic evidence to vary its terms is inadmissible. (*Holcomb* v. *Mooney*, 13 Or. 503; *Donnell* v. *Humphreys*, 1 Mont. 518; *Taylor* v. *Holter*, 1 Mont. 688.)

*Toole & Wallace*, of counsel for Appellants.

I. Was the finding of the court, that the locators of the Lightning had not, prior to their location, discovered any vein

containing rock in place, bearing known mineral deposits "of sufficient value to justify expenditure in the effort to extract them," the true standard of guidance? Was it warranted by the evidence? and herein, did the court give the phrase its *proper meaning* in applying it to the evidence? Upon this point we insist that the evidence, as disclosed by the record, taken as a whole, clearly develops that there were deposits discovered of a value "sufficient to justify expenditure in the effort to extract them." In this connection it must be borne in mind that both parties are claiming this ground as mineral land, and the government, as a party to the action, is desirous of discovering to which of the two parties, if either, a patent for this mineral land should be granted. This brings us to the question: What is sufficient discovery, so-called, to uphold a location?

Sections 2318 and 2319 of the United States Revised Statutes speak of "valuable mineral deposits," and of "lands valuable for minerals," respectively, and the latter section declares that such "deposits" shall be "open to *exploration* and purchase." There is nowhere in the act of Congress regulating this subject any provision for a prior discovery, except as it may be gathered by inference by the language of the two preceding sections. Section 2324, the only section assuming to define the manner of segregating a claim from the public domain, while providing for marking of boundaries and for the contents of a record, if any be made, makes no provision for a discovery previous to either. This requirement is imposed pursuant to authority of the act of Congress, by section 1497, page 1054, of our own State statutes, and the language of that section is that before the would-be locator shall be entitled to record the notice previously provided for, he shall have discovered, first, "a vein or crevice of quartz or ore with at least one well defined wall." If the testimony of the locators of the Lightning be accepted as the true version of their acts, it is manifest that they developed a vein, that they developed a thoroughly well defined wall, called the hanging wall, and that within the boundaries of that vein they found ore matter bearing mineral. To deny the sufficiency of such a discovery would be an event in mining history disastrous in the extreme in its results.

The word "known," used by the court in its findings, nowhere appears in the provisions of the act of Congress, and can only be found in some of the railroad land grant acts in the exception clause, where the term "mineral lands" is oftentimes further modified by excluding iron and coal.   It would be unfair to adopt this provisional and qualified description — intended to except from a grant lands of a specific character at the time the grant takes effect — for the purpose of defining lands subject to exploration and purchase, as between the would-be locators and the government.   So, too, the language of the exception in the Town Site Act (§ 2392) varies in turn. Section 2386 of that act expressly recognizes the exception of claims from its operation, leaving by express reservation, however, the validity of such claims as between the claimants and the government still an open question.   We insist that the word "exploration," as used in section 2319, *supra*, is of the utmost significance in this connection.   In addition to the cases cited by associate counsel upon this proposition, we call the attention of the court to the late case of *Davis* v. *Weibbold*, 139 U. S. 507, where there is an exhaustive discussion of the term "known mineral lands" in connection with the reservation clause in the town-site act and in railroad land grants, and where the decisions are exhaustively reviewed.

II.   Re-affirming the position that the deeds of Koegel and Nelson did not convey more than the ground called for under the original location of the Edna, we yet desire to insist that there could be no estoppel as against the Lightning Claim or its owner, for three reasons:  (a) This is an action upon an adverse claim to determine the right of possession not only as between the individuals, but as to the government, i. e., which claim has segregated the land within its boundaries from the public domain, so as to entitle the claimants, by virtue of it, to a patent from the United States.   The Lightning was located by qualified locators, Watson and Donnelly, at a time when the Edna had not segregated the premises in controversy from the public domain.   What, then, was the effect of this location by Watson and Donnelly?   Manifestly it· segregated the premises in controversy as a part of the Lightning Lode, and vested the exclusive right of possession in Watson and Donnelly,

who, as locators, and under the name of the Lightning, had con-
nected themselves with the government.   Such a location would
have been necessary to segregate this land and to establish as
to it any right of possession.   The Lightning having been
recorded, all subsequent purchasers of the Edna Claim, or any
interest in it, were charged with notice of the Lightning Claim,
its boundaries, and the extent to which, as a valid mining claim,
it occupied the earth's surface.   (*Deffeback* v. *Hawke,* 115 U. S.
407.)   The Lightning then invested in its locators an exclusive
right to claim a patent for this ground from the government.
The effect of this doctrine of estoppel invoked by the court
would be to destroy the Lightning location, and send the patent
of the government to the Edna, whereby the United States
would be made to grant a patent to those who never had a loca-
tion sufficient to entitle them thereto.   A mining claim may be
lost by forfeiture or abandonment, but never by estoppel.   The
facts found by the court might be presented in a subsequent
suit to declare a trust in Nelson and Koegel to the extent of
their one-half interest in the premises in controversy under the
Lightning location, but they cannot have the effect of impair-
ing or destroying the connection between the government and
the Lightning location. .(*Saunders* v. *Mackey,* 5 Mont. 523–
534.)   When Watson and Donnelly located the Lightning they
initiated a new title under the United States.   This title is the
only one the government would recognize.   Their conveyance
to Nelson and Koegel, qualified locators themselves, does not
defeat the location or change it status as to the United States.
Nothing short of a conveyance to an alien would have this
effect.   (*Tibbetts* v. *Ah Tong,* 4 Mont. 536–543.)   (*b*) This
deed of Nelson, and also the deed of Koegel, to respondent's
predecessors was of the *Edna Claim* only — it did not purport
to convey a fee-simple absolute, but simply the claim and right
of possession existing by virtue of the location.   Hence, the
statute of Montana as to after-acquired title clearly could have
no application.   Moreover, it did not assume to convey a por-
tion of the earth's surface by metes and bounds, designating it
for convenience as the Edna, in which event it might be con-
tended that any other title, howsoever acquired, to any portion
within the bounds would inure to the benefit of the grantee.

To say that by such a deed they were estopped would be to place a limitation upon their rights as citizens, to connect themselves with the government. Again, even if there had been a forfeiture of the Edna, this doctrine is clearly opposed to the principle announced in *Mackey* v. *Saunders, supra;* and so the court erred in permitting Nelson to explain that which he intended to convey by the deed for the additional reason that nothing beyond the Edna Claim, so designated in the deed, could be imported into it. And the purchasers under this deed knew, or were presumed to know, that all they could acquire by its terms was the right of possession, much or little, appertaining to this Edna Claim, being also charged with record notice of the existence of the Lightning. (*Deffeback* v. *Hawke,* 115 U. S. 407.) (c) Shreve became a cotenant in the Lightning to the extent of a one-half interest by the same deed whereby Nelson acquired his interest. Shreve never was in any manner connected with the Edna, and by conveyance from Watson and Donnelly became the owner of an undivided one half of the premises in dispute. How an alleged estoppel as against his cotenant Nelson could affect his interest, we fail to understand.

*Word & Smith,* for Respondent.

I.   Section 2319 of the United States Revised Statutes provides: "That all *valuable mineral deposits* in land belonging to the United States . . . . are declared to be free and open to exploration," etc. This section has been frequently before the courts, and has been construed so that the matter is now practically settled as to the character of land that can be entered under the United States mineral laws. The cases cited by counsel for appellant are simply definitions of "veins." There may be veins well defined, and still barren of any kind of mineral. Such veins are not subject to location under the mineral laws. Before there can be a location of a mineral claim there must be a discovery of "*valuable* mineral deposits." The word "valuable" in the statute of the United States qualifies the word "deposits" and not the word "mineral." Both words, "valuable" and "mineral," are adjectives qualifying "deposits."

As to the character of land that can be located under the mineral laws, and for definition of mineral land, see *Deffeback* v. *Hawke,* 115 U. S. 392; *Davis* v. *Weibbold,* 139 U. S. 507; *Colorado Coal etc. Co.* v. *United States,* 123 U. S. 307; *Alford* v. *Barnum,* 45 Cal. 482; *Merrill* v. *Dixon,* 15 Nev. 401; *Territory* v. *Mackey,* 8 Mont. 173; *Erhardt* v. *Boaro,* 113 U. S. 536.

II. Turning now to the question of estoppel pleaded and relied upon by the respondent, it will be observed that in May, 1889, the two west corners of the Edna Lode were changed and the line thrown some further to the south. At the time of this change both of the plaintiffs, Nelson and Koegel, were owners of the Edna Claim, and the plaintiff Nelson actually assisted in moving these corners. No new record of the change was made, because the owners supposed the old record was sufficient to cover the ground as embraced after the change. After this change of corners, to wit, on the seventeenth and twenty-first days respectively of August, 1889, Koegel and Nelson conveyed all their interest in the Edna Lode to respondent's grantors by deeds of bargain and sale. These deeds are under the statute, section 285, page 665, fifth division, made warranty deeds of the title. It will be remembered that when the deeds were made the owners of the Edna Lode thought or supposed the old record was sufficient to take in the ground covered by the change. The description of the premises conveyed in the deeds of Nelson and Koegel is almost identical. The description of the Edna Lode in the location notice reads: "Beginning at discovery shaft, and measuring one hundred feet to a post marked eastern boundary Edna Lode; thence northerly three hundred feet to a post marked northeast corner Edna Lode; thence westerly fifteen hundred feet to post marked northwest corner Edna Lode," etc. Then, so far as the lines running east and west are concerned, the only call or direction is westerly, hence, after the change of corners the lines still ran westerly, and by the map and evidence introduced in the cause, ran more directly to the west after the change than before. Now, as the description in the deeds and location would meet the description of the claim after the change, as well as before the corners were moved, it was competent and proper to prove

by parol evidence what was actually intended to be conveyed by the deed. The deed was equally susceptible of covering two subjects, or one of two pieces of land; it may have been either one or the other. Hence, the court committed no error in permitting respondent to show by the grantor, Nelson, by parol evidence, just what land was intended to be embraced in the deed. This was not contradicting the deed, but was simply explaining what was intended as the subject-matter. (See 1 Greenleaf on Evidence [14th ed.], §§ 285–288, inclusive, and notes; *Donnell* v. *Humphreys*, 1 Mont. 526; *Reamer* v. *Nesmith*, 34 Cal. 624; *Lake Vineyard etc. Association* v. *San Gabriel Orange Grove*, 58 Cal. 51; *Reed* v. *Proprietors of Locks and Canals*, 8 How. 274; Stephen's Digest on Evidence, art. 91, subd. 7; *French* v. *Carhart*, 1 N. Y. 96; *Swain* v. *Saltmarsh*, 54 N. H. 9; Starkie on Evidence [9th ed.], pp. 649, 680.)

In this case the plaintiffs at the time of their deeds to respondent's grantors in August, 1889, supposed that they were the owners of the Edna Lode, as marked by the new or changed condition of the lines, and supposing their record covered the new as well as the old lines, it was entirely competent and proper to prove by parol evidence what was actually intended as the subject-matter of the conveyance. · This proof did not change or contradict the deed, but only assisted to explain its terms in the light in which it was executed by the parties. There is another rule of law which is always to be applied in cases where there is any doubt as to the true intent of the parties to a deed. In such cases the deed is to be construed most strongly in favor of the grantee and against the grantor. (*Bender* v. *Fromberger*, 4 Dall. 436; 2 Washburn on Real Property [2d ed.], p. 669, side p. 628; *Vance* v. *Fore*, 24 Cal. 436; *Piper* v. *True*, 36 Cal. 606; *Sullivan* v. *Davis*, 4 Cal. 291.) The record shows that the plaintiffs, Nelson and Koegel, conveyed to respondent's grantors all their interest in the Edna Lode by the deed referred to, *supra*, and the plaintiff Shreve derived his title to the Lightning Lode from Nelson and Koegel; it follows, then, that if the deeds from Nelson and Koegel covered the land embraced in the Edna lines after the change, then the plaintiffs are estopped from.

setting up an outstanding title against their grantees, and any such title which may be afterwards acquired by them inures to the benefit of their vendees. (Comp. Laws Mont. fifth div. § 267, p. 662; *House* v. *McCormick,* 57 N. Y. 310; 1 Washburn on Real Property [2d ed.], pp. 467, 468, 469; *Irvine* v. *Irvine,* 9 Wall. 617; *Van Rensselaer* v. *Kearney,* 11 How. 297; *Stoddard* v. *Chambers,* 2 How. 284; *Easton* v. *Salisbury,* 21 How. 426; *Morgan* v. *Curtenius,* 20 How. 1; *Hitchens* v. *Nougues,* 11 Cal. 28; *Clark* v. *Baker,* 14 Cal. 630; 76 Am. Dec. 449; *Green* v. *Clark,* 31 Cal. 591.)

The court having found that the plaintiffs by their deeds intended to convey all their interest in the Edna Lode, which they had on the seventeenth and twenty-first days of August, 1889, the conclusion of law that the plaintiffs are estopped from asserting an adverse or afterwards acquired title is correct and proper. If the court is correct in this particular all the other points may be erroneous, and still the judgment of the court must be affirmed. Coming to the change of lines by the owners of the Edna Lode, the claim of respondent is, that if there was no valid location of the Lightning Lode, if there had been no discovery, the ground embraced therein was public domain, and the Edna claimants had the right to change their lines and corners, so as the change did not interfere with prior vested rights of third parties. (*Golden Fleece Co.* v. *Cable Co.* 1 Morr. Min. Rep. 136, 137; *McGinnis* v. *Egbert,* 8 Colo. 41; *McEvoy* v. *Hyman,* 25 Fed. Rep. 596; *Gregory* v. *Pershbaker,* 73 Cal. 118; *Doe* v. *Sanger,* 83 Cal. 208.)

BLAKE, C. J. — It appears from the findings of facts, which are admitted by the parties, that the Edna Lode Mining Claim was discovered June 4, 1887, and that the boundaries were marked by posts at each corner and the center of each end line. The notice of location was filed June 15, 1887, in the office of the recorder of Jefferson County. The owners of the Edna Lode Mining Claim, including Frank Nelson and Charles Koegel, two of the appellants herein, moved, May 13, 1889, "the two stakes at the west end between five and six hundred

feet further south, but did not change the stakes at the east end; and that the old original west end stakes were not removed, but were left standing as they were prior to the said swinging around of the boundaries." Said Nelson "actually assisted in moving said corners." Koegel, by his deed, which was executed August 17, 1889, conveyed to the grantors of the respondent all his right, title, and interest in and to the Edna Lode Mining Claim. The description of the premises is as follows: "An undivided one-fourth ($\frac{1}{4}$) interest in and to that certain piece or parcel of land known as the 'Edna Quartz Lode Mining Claim,' situate in Cataract (unorganized) mining district, Jefferson County, Montana Territory. Said Edna Lode is fully described in the notice of location thereof, which is recorded in the office of the county clerk and recorder of Jefferson County, Montana. Also an undivided one-fourth interest in all tools, mining improvements, and buildings, together with all the dips, spurs, and angles, and also all the metals, ores, gold and silver bearing quartz, rock, and earth therein; and all the rights, privileges, and franchises thereto incident, appendant, and appurtenant, or therewith usually had and enjoyed; and also all and singular the tenements, hereditaments, and appurtenances thereto belonging or in any wise appertaining, and the rents, issues, and profits thereof; and also all the estate, right, title, interest, property, possession, claim, and demand whatsoever, as well in law as in equity, of the said party of the first part, of, in, or to said premises, and every part and parcel thereof, with the appurtenances. *To have and to hold,* all and singular, the said premises, together with the appurtenances and privileges thereto incident, unto the said parties of the second part, their heirs and assigns, forever. It is expressly covenanted that it is intended hereby to convey any and all right, title, interest, and estate which may hereafter be acquired to said premises, or any part thereof, by virtue of any patent, which may hereafter be issued by the United States government therefor, under proceedings heretofore instituted in that behalf."

Nelson, by his deed, which was executed August 21, 1889, also conveyed all his right, title, and interest in the Edna Lode Mining Claim to the grantors of the respondent. The same

language is used in describing the premises which were conveyed by Koegel, with this exception, that the following recitals appear: "Said claim is recorded on page 488 of Book P of Lode Locations of Jefferson County;" and "Said mill-site is recorded on page 85 of Book H of the Records of Jefferson County."

What was the intention of said Nelson and Koegel in the execution of these instruments? What right, title, or interest in the Edna Lode Mining Claim was embraced in the foregoing deeds? The Code of Civil Procedure has prescribed the rule for their interpretation: "For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret." (§ 632.) "The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is, nevertheless, admissible that they have a local, technical, or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement must be construed accordingly." (§ 633.) The statute is a codification of the decisions of the courts upon this subject. The property in controversy is of a peculiar and exceptional character. Parties who comply with the laws of the United States and this State, and the local customs and regulations of a mining district, acquire the right to occupy, possess, and explore a lode mining claim. The discoverers do not usually make an accurate survey of the premises; and the notices of location contain a description in general terms, and by name. When the true course of the vein has been ascertained by development, the boundaries are usually changed to protect the interest of the claimants. The owners of the Edna Lode Mining Claim availed themselves of this privilege, which is valid under certain conditions, and about three months after these boundaries had been changed and restaked, the deeds were executed by Nelson and Koegel.

In *Phillpotts* v. *Blasdel*, 8 Nev. 70, the court quotes with approval the following extract from the opinion of the district judge, the Hon. W. H. Beatty, who, since that time, has been an honorable member of the Supreme Courts of the States of

California and Nevada, viz.: "I agree with the plaintiff that when a man conveys a lode, we have only to ascertain, by the best means in our power, what lode of ore he meant; and, if we can do so, it makes no difference that he has called it by a name illegitimately acquired — a name only applied to it by reason of his ignorance of the truth. Effect must be given to his real intention, and the lode intended must be held to have been conveyed." The court in *Truett* v. *Adams,* 66 Cal. 221, says: "In trying to ascertain that intention, it is the duty of a court to assume, as nearly as possible, the position of the contracting parties, and to question the circumstances of the transaction between them, and then to read and interpret the words which they used in the light of those circumstances." Chief Justice Wade, in *Taylor* v. *Holter,* 1 Mont. 695, recognized this rule for the interpretation of a deed, and said: "The intent of the parties must be gathered from what is written, rather than from parol evidence; but the language of the instrument may be construed by the light of surrounding circumstances, and, so far as possible, the court may put itself in the place of the parties, and may interpret the language from this stand-point, *but nothing can be added to or taken from the written words.*" (See, also, *Donnell* v. *Humphreys,* 1 Mont. 518, and *United States* v. *Power,* 6 Mont. 271.)

Let us apply to the instrument before us the principle which has been established by the authorities and the Code of Civil Procedure. The intention of Nelson and Koegel is clearly expressed in their respective deeds, and they thereby parted with their right, title, and interest in the Edna Lode Mining Claim, as this property was known to them in August, 1889, and for which a patent might be issued by the government of the United States. It is contrary to the words and acts of Nelson and Koegel to say that they intended to sell, and their grantees wished to buy, the Edna Lode Mining Claim, as originally located, when they had abandoned a portion thereof to the public, and were not seeking any patent thereto. In order to obtain this patent, it is essential that a number of acts should be done by the applicants, and the Edna Lode Mining Claim was surveyed according to the boundaries which had been fixed by the change of the lines by Nelson and Koegel and the owners in

the month of May, 1889.   When the application for patent was
made in the United States land office by the respondent, which
was then the owner thereof, the appellants filed a protest, for
the reason that the parcel in controversy was a part of the
Lightning Lode Mining Claim.   The following findings of
facts by the court should be considered upon this branch of the
case: —

"11.  That on October 30, 1889, plaintiffs, Nelson and Koegel,
bought out all the interest which Watson and Donnelly had in
the Lightning Claim.

"12.  That the plaintiff Shreve derived his title or interest in
the Lightning Claim by purchase from Nelson and Koegel."

The court below held that Nelson and Koegel were estopped
by their deeds, and prevented from asserting any claim to the
area in conflict.   The question of ownership of the Lightning
Lode Mining Claim, or the validity of its location, is not in-
volved in this inquiry.   If the appellants succeed in this liti-
gation, they prevent the respondent from securing the Edna
Lode Mining Claim, which they "expressly covenanted" that
its grantors, and "their heirs and assigns forever," should have
and hold.

In *Van Rensselaer* v. *Kearney*, 11 How. 297, the court,
through Mr. Justice Nelson, said:  "And therefore, if the deed
bears on its face evidence that the grantors intended to convey,
and the grantee expected to become invested with, an estate of a
particular description or quality, and that the bargain had pro-
ceeded upon that footing between the parties, then, although it
may not contain any covenants of title in the technical sense of
the term, still the legal operation and effect of the instrument
will be as binding upon the grantor, and those claiming under
him in respect to the estate thus described, as if a formal cove-
nant to that effect had been inserted; at least, so far as to stop
them from ever afterwards denying that he was seised of the
particular estate at the time of the conveyance. . . . . The
principle deducible from these authorities seems to be that,
whatever may be the form or nature of the conveyance used to
pass real property, if the grantor sets forth on the face of the
instrument, by way of recital or averment, that he is seised or
possessed of a particular estate in the premises, and which estate

the deed purports to convey; or, what is the same thing, if the seisin or possession of a particular estate is affirmed in the deed, either in express terms or by necessary implication, the grantor, and all persons in privity with him, shall be estopped from ever afterwards denying that he was so seised and possessed at the time he made the conveyance. The estoppel works upon the estate, and binds an after-acquired title as between parties and privies. The reason is that the estate thus affirmed to be in the party at the time of the conveyance must necessarily have influenced the grantee in making the purchase, and hence the grantor, and those in privity with him, in good faith and fair dealing, should be forever thereafter precluded from gainsaying it. The doctrine is founded, when properly applied, upon the highest principles of morality, and recommends itself to the common sense and justice of every one. And although it debars the truth in the particular case, and therefore is not unfrequently characterized as odious, and not to be favored, still it should be remembered that it debars it only in the case where its utterance would convict the party of a previous falsehood — would be the denial of a previous affirmation upon the faith of which persons had dealt, and pledged their credit or expended their money. It is a doctrine, therefore, when properly understood and applied, that concludes the truth in order to prevent fraud and falsehood, and imposes silence on a party only when in conscience and honesty he should not be allowed to speak."

In *Smith* v. *Williams*, 44 Mich. 242, Mr. Justice Cooley for the court said : "Where one assumes by his deed to convey a title, and by any form of assurance obligates himself to protect the grantee in the enjoyment of that which the deed purports to give him, he will not be suffered afterwards to acquire or assert a title, and turn his grantee over to a suit upon his covenants for redress. The short and effectual method of redress is to deny him the liberty of setting up his after-acquired title as against his previous conveyance. This is merely refusing him the countenance and assistance of the courts in breaking the assurance which his covenants have given." (*Long Island R. R. Co.* v. *Conklin*, 29 N. Y. 572; *Doe* v. *Dowdall*, 3 Houst. 369.)

In *Kelly* v. *Taylor*, 23 Cal. 11, the court below instructed the jury "that in the matter of estoppel a different rule applies to mining claims from that applicable to other species of real estate." But Mr. Justice Crocker in the opinion said: "The first branch of this instruction is erroneous. The rules of law relating to estoppel *in pais* apply to mining ground, the same as any other real estate claimed under a similar kind of title." (See, also, *Clark* v. *Baker*, 14 Cal. 612; 76 Am. Dec. 449; *Fields* v. *Squires*, Deady, 366; *Yunker* v. *Nichols*, 1 Colo. 563; *Smith* v. *Moodus W. P. Co.* 35 Conn. 400; *Karnes* v. *Wingate*, 94 Ind. 594; *Dobbins* v. *Cruger*, 108 Ill. 188; *Irvine* v. *Irvine*, 9 Wall. 617; *Moore* v. *Crawford*, 130 U. S. 122; *Ryan* v. *United States*, 136 U. S. 68.)

The Code of Civil Procedure provides as follows: "When the terms of an agreement have been intended in a different sense by the different parties to it, that sense is to prevail against either party in which he supposed the other understood it; and when different constructions of a provision are otherwise equally proper, that is to be taken which is most favorable to the party in whose favor the provision was made." (§ 636.) The language seems to be decisive in its application to the deeds of the appellants.

The authorities seem to be in harmony upon this question, and we are of the opinion that the court below construed correctly the deeds of Nelson and Koegel, and held that these parties were thereby estopped from maintaining this action. The appellant Shreve obtained his title and interest to the Lightning Lode Mining Claim from Nelson and Koegel, and being in privity with them, is also in like manner estopped.

We concur in the views of Mr. Justice DE WITT regarding the construction of the law applicable to the discovery and location of the Lightning Lode Mining Claim.

It is ordered and adjudged that the judgment be affirmed.

*Affirmed.*

HARWOOD, J., concurs.

DE WITT, J. (*dissenting*). — As the majority of the court affirm the judgment, on the ground of the estoppel, they are freed from any discussion of the question of the "discovery."

As I do not agree with the views expressed upon the estoppel, it is necessary for me to state, first, my opinion in reference to the "discovery." I observe the following facts pertinent to my inquiry.

The respondent applied to the United States for a patent upon the Edna Quartz Lode Mining Claim. The appellants contested that application, alleging that they were entitled to the Lightning Claim, which claim included a portion of the alleged Edna, the area in conflict being designated upon the accompanying plat below, by Fig. G, H, I, F.

In pursuance to the United States statute, the contention was referred to the State District Court for determination. (Rev. Stats. U. S. § 2326.)

The case was tried to the court without a jury. The court found that the defendant was entitled to judgment for the possession of the premises in controversy. Very complete special findings of fact and conclusions of law were made by the court.

The plaintiffs' Lightning Claim was located July 7, 1888 (plat, K, L, H, J), and recorded July 17, 1888. The Edna was staked and located June 4, 1887 (plat, A, B, C, D), and recorded June 15, 1887. The claim was marked upon the ground by its locators in such a manner that its area did not

conflict with the after location, July 7, 1888, of the Lightning (plat, K, L, H, J).

On May 13, 1889, after the alleged location of the Lightning, the Edna people made new westerly corners five or six hundred feet further to the south, thus making new lines for the Edna (shown in plat by Fig. B, C, F, E), and which thus brought the Edna into conflict with the Lightning. The Edna owners did not remove the old original westerly corner stakes, but left them upon the ground, and erected new ones at the new westerly corners. No amended or new location notice, indicating this change in the surface lines, was made until November 19, 1889, at which time such a record was made.

Upon the motion for a new trial, two alleged errors of the court were urged, and are treated in the opinion below, and which may be stated as follows:—

1. The plaintiffs sought to establish the validity of the Lightning location. Among other facts material to their claim, they sought to show that they had, before recording their claim, made a proper discovery upon the premises, which entitled them to locate it as a mine. Upon this proposition the defendant asked the court to find as a fact as follows: "The court finds as a fact that at the time of the posting of the notice and marking of the boundaries of the Lightning Claim there had not been discovered on said claim any vein, lead, or lode, or rock in place, bearing mineral or other valuable deposit; nor was there any wall of a lead or lode discovered or developed at said time."

Defendant also asked that the following conclusion of law be found: "That the Lightning Claim and location is invalid and of no force, for want of a discovery of any vein or lode containing rock bearing known valuable mineral deposits at the time of the location of said claim, or prior thereto."

The court was not satisfied with this proposed finding and conclusion, but modified them, and found as a fact "that, prior to the time of location by posting the notice and marking the boundaries of said Lightning Mining Claim, there had not been any actual discovery of any vein or lode containing rock in place, or any rock bearing any known mineral deposits of sufficient value to justify expenditure in the effort to extract them."

And upon this fact the court declared the law, and said "that the Lightning Claim and location is invalid and of no force, for the absence of a discovery of any vein or lode containing rock bearing known mineral deposits of such richness as to justify work to extract them, at or prior to the time of the location of the surface ground of said claim." This finding of fact, and the conclusion of law thereupon, the appellants specify as error, claiming that the court adopted an erroneous construction of the requirements of the law as to a discovery entitling a claimant to make a location.

2. The court found that plaintiffs were estopped from claiming the premises in controversy, the portion of the ground in conflict between the Edna and the Lightning (plat, G, H, I, F). The facts upon which the estoppel was predicated are: Frank Nelson and Charles Koegel were joint plaintiffs with Shreve. The evidence by deeds was that Nelson and Shreve became owners in the Lightning, by purchase from the locators, November 8, 1889, and Koegel, by purchase, March 20, 1890. But the finding of the court is that Nelson and Koegel bought the whole of the Lightning from the locators, and that plaintiff Shreve derived his title by purchase from Nelson and Koegel. This finding is not attacked in the specifications. On May 13, 1889, Nelson and Koegel were owners in the Edna. On that day the new westerly end corners of the Edna, noticed above, which were originally further north (plat, A and D), were made at the points further south (plat, E and F). Nelson knew of this change, and assisted therein. It does not appear that Koegel knew of it, or assisted in moving the corners. The old stakes were left at the old corners, and new ones erected at the new. But the notice of the relocation, to conform to this swing to the south, was made November 19, 1889. Between the date of setting up the new corners, May 13, 1889, and the recording a location notice, November 19, 1889, claiming the mine as described by such new westerly corners, the plaintiffs, Nelson and Koegel, on August 17th and 21st, respectively, made deeds to the grantors of the defendant.

The description of the subject-matter of Koegel's deed is as follows: "An undivided one-fourth interest in and to that certain piece or parcel of land known as the 'Edna Quartz Lode

Mining Claim,' situate in Cataract (unorganized) mining district, Jefferson County, Montana Territory. Said Edna Lode is fully described in the notice of location thereof, which is recorded in the office of the county clerk and recorder of Jefferson County, Montana." This deed contains the further covenant: "It is expressly covenanted that it is hereby intended to convey any and all right, title, interest, and estate which may hereafter be acquired to said premises, or any part thereof, by virtue of any patent which may hereafter be issued by the United States government therefor, upon proceedings heretofore instituted in that behalf."

The Nelson deed was practically the same, and needs no further recital.

Nelson was called as a witness for the defendant, and, over the objection and exception of the plaintiffs, testified in reference to the deed mentioned: "It was my intention to convey by that deed all my interest in the Edna Lode, all that was covered by the change of lines, and all the title I acquired by reason of this change. I sold all my right, title, and interest in the Edna to this disputed ground. I intended to convey everything, whether it was in the new lines or not. I included everything, whether it was in the new location or otherwise, just as it might be. At the time I sold I did not know that there was any dispute over this ground. I meant to convey everything I had acquired. The record that I refer to in the deed was made the 4th of June, 1887. I sold all that I had on record. I did not sell anything else but what was on record. I considered that what was obtained by the change of the corners belonged to the claim, and I intended to sell that."

Nelson was only one of the plaintiffs against whom the estoppel was invoked. Koegel did not give similar testimony as to his intention. Shreve had nothing to say upon the subject.

The court found as a fact, "that the plaintiffs, Frank Nelson and Charles Koegel, were owners in the Edna Lode at the date of May 13, 1889, when the two west stakes of said claim were moved further south, and the plaintiff Nelson actually assisted in moving said corners; that on the seventeenth and twenty-first days, respectively, of August, 1889, and after the change

of the two west end corners of the Edna Lode had been made, said plaintiffs, Nelson and Koegel, conveyed absolutely, by deed of bargain and sale, to Riggs and Bradley (grantors of defendant), every and all right, title, interest, and estate which either of them had, or that thereafter might be acquired, in and to said Edna Lode, or any part or portion of the same."

The law, upon this fact found, the court declared in the following words: "That the plaintiffs are estopped by their deeds from asserting title to any part of the ground embraced in the Edna Lode, as it was marked off and designated on the seventeenth day of August, 1889, and prior thereto." Appellants specify error in the view that the court took of the estoppel claimed.

As to the first proposition set forth in the statement of the case as just made, under the view of the law that I entertain, I do not deem it necessary to examine the evidence upon which the finding of fact was made. I will assume, therefore, that it was the fact that, at and prior to the time of the location of the Lightning Claim, the locators had not made any discovery of a vein or lode containing rock in place, or any rock, bearing any known mineral deposits of sufficient value to justify expenditure in the effort to extract them. Turning my attention to the conclusion of law by the court, my investigation reduces itself to this succinct inquiry: Under the mining laws must the claimant of an alleged quartz lode mining claim, before he makes his location, discover a vein or lode containing rock bearing known mineral deposits of such richness as to justify work to extract them? or, in the language of the miner, what is a discovery?

The United States Revised Statutes, which are the charter of the miner's rights upon the public domain, declare: "Sec. 2319. All valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States."

"Sec. 2322.   The locators of all mining locations heretofore made, or which shall hereafter be made, on any mineral vein, lode, or ledge, situated on the public domain, . . . . shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth," etc.

The State law, after defining the method of recording mining claims (Comp. Stats. div. 5, § 1477), declares: "Sec. 1479. That in order to entitle any person or persons to record, in the county recorder's office of the proper county, any lead, lode, or ledge, there shall first be discovered on said lode, lead, or ledge, a vein or crevice of quartz or ore with at least one well defined wall."

The mineral lands of the United States being open to exploration and purchase, the first step of the prospector is the discovery of a mine. Having discovered his mine, he locates it, and records it in the manner prescribed by law. Under the statutes we may therefore say that the miner who discovers a lead, lode, or ledge, with a vein or crevice of quartz with one well defined wall, containing a valuable mineral deposit, is entitled to locate, record, and hold the same, upon compliance with the provisions of the law.

The formalities of location and recording are not here in question. We need not again inquire what is a lead, lode, or ledge, or vein, except as to its quality of valuableness, which we discuss below. We have endeavored in *King* v. *Amy etc. Min. Co.* 9 Mont. 565, to express our views as to what constitutes a vein, except that the matter of value was not there under consideration; and the views that we there recorded we believe, as far as they go, to be in harmony with the utterances of the Supreme Court of the United States, the court of last resort upon that proposition.

Advancing in the consideration of the matter before us, it appears that, if the District Court was correct in its conclusion of law in this case, then the miner must not only discover a vein, "a continuous body of mineralized rock, lying within any other well defined boundaries on the earth's surface or under it," which vein shall answer the definitions which the courts have given of that term, but, before he can locate that vein as a

mine, he must discover known mineral deposits of such richness as to justify work to extract them.

Assuming that the mineralized vein is found, the mineral deposit discovered, the whole proposition reduces itself to the interpretation of the word "valuable," as used by the statute. Must the deposit, at the time of location, be valuable enough to pay to work as a mine, or must some other intention be discovered as the true intent of the use of the word "valuable?" The miner has twenty days in which to record his claim, in order to protect his right of possession. Must his prospective mine appear, within these twenty days, to be valuable enough to pay for extracting the minerals, or must the quality of valuableness be determined upon considerations other than the certainty of a paying mine at the time of location?

Distinguished judges in the mining countries have recorded their views of what constitutes a miner's lode or vein. Their language is as household words in the courts and among the lawyers and miners of the State. But the importance of the proposition of law, which we are considering as a first impression, induces me to cite from familiar opinions which I believe shed light upon the matter before us.

Mr. Justice Emerson, in *Harrington* v. *Chambers*, 3 Utah, 94, said : " I have long thought, and still think, that under the requirements above quoted, a valid location of a mining claim may be made whenever the prospector has discovered such indications of mineral that he is willing to spend his time and money in following, in expectation of finding ore."

In *Stevens* v. *Gill*, in the United States Circuit Court for the district of Colorado, we find Judge Hallett using the following language: " As to all such contacts and all such deposits as are found in the neighborhood of Leadville, a lode cannot exist without valuable ore, but, if there is value, the form in which it appears is of no importance; whether it be of iron, or manganese, or carbonate of lead; or something else yielding silver, the result is the same. The law will not distinguish between different kinds and classes of ore if they have appreciable value in the metal for which the location was made. Nor is it necessary that the ore shall be of economical value for treatment. It is enough if it is something ascertainable, something

beyond a mere trace, which can be positively and certainly verified as existing in the ore. In the case of silver ore, the value must be reckoned in ounces, one or more, in the ton of ore, and if it comes to that it is enough, other conditions being satisfied, to establish the existence of the lode." It is observed that Judge Hallett is speaking of the existence of the lode, and what is required to prove such existence. Justice Emerson above expresses his views of what is required in the matter of a mineral discovery to entitle one to locate.

Mr. Justice Field's definition and discussion of the term "lode," in *Eureka Con. Min. Co.* v. *Richmond Min. Co.* 4 Sawy. 302, has long been an authority. We cite but briefly as follows: "As used by miners, before being defined by any authority, the term 'lode' simply meant that formation by which the miner could be led or guided. It is an alteration of the verb 'lead'; and whatever the miner could follow, expecting to find ore, was his lode. Some formation within which he could find ore, and out of which he could not expect to find ore, was his lode. The term 'lode star,' 'guiding star,' or 'north star' is of the same origin." This is the language of one of the witnesses as quoted by Justice Field.

There is the well-known language of Judge Sawyer, used in *North Noonday Min. Co.* v. *Orient Min. Co.* 6 Sawy. 299; 1 Fed. Rep. 522, and also in *Jupiter Min. Co.* v. *Bodie Con. Min. Co.* 11 Fed. Rep. 675: "The statute also provides that 'no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located.' So that no rights can be acquired under the statute by a location made before the discovery of a vein or lode within the limits of the claim located. A vein or lode authorized to be located is a seam or fissure in the earth's crust filled with quartz, or with some other kind of rock, in place, carrying gold, silver, or other valuable mineral deposits named in the statute. It may be very thin, and it may be many feet thick, or thin in places — almost or quite pinched out, in miner's phrase — and in other places widening out into extensive bodies of ore. So, also, in places, it may be quite or nearly barren, and at other places immensely rich. It is only necessary to discover a genuine mineral vein or lode, whether small or large, rich or poor, at the point of

discovery within the lines of the claim located, to entitle the miner to make a valid location including the vein or lode. It may, and often does, require much time and labor and great expense to develop a vein or lode after discovery and location sufficiently to determine whether there is a really valuable mine or not, and a location would be necessary before incurring such expense in developing the vein to secure to the miner the fruits of his labor and expense in case a rich mine should be developed. If, then, the locators . . . . discovered such a mineral vein or lode as I have described, however small, before the location of that claim, the location of the claim, embracing within its lines the vein or lode so discovered, was, in this particular, valid."

We find Mr. Justice Miller remarking, in *Iron Silver Min. Co.* v. *Cheesman*, 116 U. S. 538 : "If the language here excepted to [speaking of an instruction given in the court below] stood alone, it would be correct, though possibly too general or exclusive. Certainly the lode or vein must be continuous, in the sense that it can be traced through the surrounding rocks, though slight interruptions of the mineral-bearing rock would not alone be sufficient to destroy the identity of the vein. Nor would a short partial closure of the fissure have that effect, if a little farther on it recurred again with mineral-bearing rock within it. And such is the idea conveyed in the previous part of the charge. 'On the other hand,' said the judge, 'with well defined boundaries, very slight evidence of ore within such boundaries will prove the existence of a lode. Such boundaries constitute a fissure, and if in such fissure ore is found, *although at considerable intervals and in small quantities*, it is called a lode or vein.'"

Such are some of the well considered opinions as to what constitutes a lode or vein, and touching to some extent the requirements of the valuableness of the deposit claimed as a mine. We are then offered by respondent a line of authorities which he submits sustain the conclusion of the District Court. They are *Deffeback* v. *Hawke*, 115 U. S. 392; *Colorado Coal etc. Co.* v. *United States*, 123 U. S. 307; *Erhardt* v. *Boaro*, 113 U. S. 536; *Alford* v. *Barnum*, 45 Cal. 482; *Merrill* v. *Dixon*, 15 Nev. 401; *Territory* v. *Mackey*, 8 Mont. 173, and the recent case of *Davis* v. *Weibbold*, 139 U. S. 507, which last case reviews the previous

learning of the United States Supreme Court, and all of the above-cited cases except *Erhardt* v. *Boaro*, and *Territory* v. *Mackey*. I will therefore examine *Davis* v. *Weibbold*, including in its discussion, as it does, the former cases, and endeavor to ascertain whether the Supreme Court of the United States, which is controlling authority in the matter under consideration, does hold that a mining location, otherwise good, is invalid, by reason of the absence of a discovery of any vein or lode containing rock bearing known mineral deposits of such richness as to justify work to extract them, at or prior to the time of the location of the surface ground of said claim.

In *Davis* v. *Weibbold*, Davis claimed the premises in controversy as a town lot in the city of Butte, Montana, deriving his title from the town-site patent of the United States to the probate judge of Deer Lodge County, dated September 26, 1877. Wiebbold relied upon a patent of the United States for the Gold Hill Mining Claim, bearing date January 15, 1880. It appeared further that Weibbold entered the land in the United States land office, and paid for the same September 19, 1878. The town-site patent antedated both Weibbold's mineral patent and his entry of the land in the land office. No proof was offered to show when the Gold Hill Mining Claim was located. "When the entry of the town site was had, and the patent issued, and the sale was made to the defendant (Davis, defendant below) of the lots held by him, it was not known—at least, it does not appear that it was known—that there was any valuable mineral lands within the town site; and the important question is whether, in the absence of this knowledge, the defendant can be deprived under the laws of the United States of the premises purchased and occupied by him because of a subsequent discovery of minerals in them, and the issue of a patent to the discoverer." (p. 518.) Such are the facts as they appeared in *Davis* v. *Weibbold*, 139 U. S. 518. After the title by the town-site patent had passed from the United States to Davis' predecessors, and on September 19, 1878, as the record in the case showed, Wiebbold took his first step towards acquiring title to the ground as a mining claim. (p. 526.) Under that state of facts, the United States Supreme Court held that Davis, the town-site claimant, could not be deprived of his town lots

because of the discovery of a mine in them, and the issuance of a patent to the mining claimant, all subsequent to the town-site patent. When that case is sought to be applied to the one at bar, it is important to observe that the court in that case was examining the *status* of the land at the *time of sale* as a town site, not at the time of its location as a mining claim; and at the time of sale as a town site it did not appear that there were any valuable mineral lands within the town site. The question which is now before this court, the valuableness of the mineral deposit in order to entitle a miner to locate the ground as a mine, was not, in the most remote manner, before the court in *Davis* v. *Weibbold;* and there is not a line or syllable in that distinguished opinion upon the proposition now presented to us. Observe the words of the court: "Thus read [the statutes of the United States], they must be held, we think, merely to prohibit the passage of title, under the provisions of the town-site laws, to mines of gold, silver, cinnabar, or copper, which are known to exist, *on the issue of the town-site patent,* and to mining claims and mining possessions, in respect to which such proceedings have been taken, under the law or customs of miners, as to render them valid, creating a property right in the holder, and not to prohibit the acquisition for all time of mines which then lay buried, unknown, in the depths of the earth. The exceptions of mineral lands from pre-emption and settlement, and from grants to States for universities and schools, for the construction of public buildings, and in aid of railroads and other works of internal improvement, are not held to exclude all lands in which minerals may be found, but only those where the mineral is in sufficient quantity to add to their richness, and to justify the expenditure for its extraction, *and known to be so at the date of the grant.* There are vast tracts of country in the mining States which contain precious metals in small quantities, but not to a sufficient extent to justify the expense of their exploitation. It is not to such lands that the term 'mineral,' in the sense of this statute, is applicable." The learned justice is here speaking of the exceptions of mineral lands passing in grants for purposes other than mines, and he places the time when it is material that the land should be known as valuable for minerals as *at the date of the grant* from

the government. It is in this connection, and in reference to the time when the government makes its grant of the land, that he uses the expressions as to there being vast mineral tracts which do not contain mineral in value to justify its exploitation or working; but he never suggests what a miner must be able to show in value of his mineral at the time he locates a mining claim upon the public unclaimed domain of the United States.

Again, consider the words of the same justice in *Deffeback* v. *Hawke:* "It is plain, from this brief statement of the legislation of Congress, that no title from the United States to land known at the time of sale to be valuable for its minerals of gold, silver, cinnabar, or copper can be obtained under the pre-emption or homestead laws, or the town-site laws, or in any other way than as prescribed by the laws specially authorizing the sale of such lands, except in the States of Michigan, Wisconsin, Minnesota, Missouri, and Kansas. We say, 'land *known* at the time to be *valuable* for its minerals,' as there are vast tracts of public land in which minerals of different kinds are found, but not in such quantity as to justify expenditures in the effort to extract them. It is not to such lands that the term 'mineral' in the sense of the statute is applicable. . . . . It is there (U. S. Rev. Stats.) enacted that 'lands *valuable* for minerals' shall be reserved from sale, except as otherwise expressly directed, and that '*valuable* mineral deposits' in lands belonging to the United States shall be free and open to exploration and purchase. We also say lands *known* at the time of their sale to be thus valuable, in order to avoid any possible conclusion against the validity of titles which may be issued for other kinds of land, in which, years afterwards, rich deposits of mineral may be discovered. It is quite possible that lands settled upon as suitable only for agricultural purposes, entered by the settler and patented by the government under the pre-emption laws, may be found, years after the patent has been issued, to contain valuable minerals. Indeed, this has often happened. We therefore use the term *known* to be valuable at the time of sale, to prevent any doubt being cast upon titles to lands afterwards found to be different in their mineral character from what was supposed when the entry of them was made and the patent issued." Here we have the same sort of language as in *Davis*

v. *Weibbold.* The expression, " known at the time of sale to be valuable for minerals," is used with such force and iteration that we cannot mistake the meaning. Is there a hint in this case that the miner, at the time of his location, must know that he has a mine sufficiently valuable to pay for working? I think not. The question before the court in *Deffeback* v. *Hawke* was as foreign to the one now before us as was that in *Davis* v. *Weibbold.*

In *Alford* v. *Barnum* the question was the known *status* of the land at or subsequent to the date of the grant, not the known qualities of the ground at the time of a location of it for mineral. *Merrill* v. *Dixon* is on the same line.

In *Cowell* v. *Lammers,* 10 Sawy. 246; 21 Fed. Rep. 200, Judge Sawyer says: " By the words ' mineral lands ' must be understood lands known to be such, or which there is satisfactory reason to believe are such at the time of the grant or patent. And the United States courts which have had occasion to act upon this subject, so far as I am aware, have adopted that idea. There must be some point of time when the character of the land must be finally determined, and for the interest of all concerned, there can be no better point to determine this question than at the time of issuing the patent."

In *Davis* v. *Weibbold,* Mr. Justice Field, after reviewing all these cases which we have mentioned, and also the decisions of the land department of the government, sums up the situation, and announces the opinion of the court in the following words: " It would seem from this uniform construction of that department of the government specially entrusted with supervision of proceedings required for the alienation of the public lands, including those that embrace minerals, and also of the courts of the mining States, federal and State, whose attention has been called to the subject, that the exception of mineral lands from grant in the acts of Congress should be considered to apply only to such lands as were *at the time of the grant* known to be so valuable for their minerals as to justify expenditure for their extraction. The grant or patent, when issued, would thus be held to carry with it the determination of the proper authorities that the land patented was not subject to the exception stated. There has been no direct adjudication upon this point by this

court, but this conclusion is a legitimate inference from several of its decisions. It was implied in the opinion in *Deffeback* v. *Hawke*, already referred to, and in the cases of *Colorado Coal & Iron Co.* v. *United States*, 123 U. S. 307, and *United States* v. *Iron Silver Min. Co.* 128 U. S. 673, 683. The learned justice then further reviews the cases which he last mentions. But it is not necessary to follow him further. Sufficient has been said to make it entirely apparent that, in the cases which respondent has pressed upon our consideration as sustaining the position of the court below in this case, the courts have had before them questions as to the valuable mineral character of the land at the time of a grant of the same by the government to applicants other than mineral claimants. From those opinions to evolve the construction of the law which was adopted by the District Court in this case is to make those courts, whose decisions I have reviewed and referred to, say that which was never within their contemplation, and which I am of opinion they would not say were the matter before them as it is before us.

We must notice one more utterance of Mr. Justice Field, upon which the respondent relies, in *Erhardt* v. *Boaro*, 113 U. S. 527: "This allowance of time for the development of the character of the lode or vein does not, as intimated by counsel, give encouragement to mere speculative locations; that is, to locations made without any discovery or knowledge of the existence of metal in the ground claimed, with a view to obtain the benefit of a possible discovery of metal by others within that time. A mere posting of a notice on a ridge of rocks cropping out of the earth, or on other ground, that the poster has located thereon a mining claim, without any discovery or knowledge on his part of the existence of metal there or in its immediate vicinity, would be justly treated as a mere speculative proceeding, and would not itself initiate any right. There must be something beyond a mere guess on the part of the miner to authorize him to make a location which will exclude others from the ground, such as the discovery of the presence of the precious metals in it, or in such proximity to it as to justify a reasonable belief in their existence. The protection will be afforded to the locator to make the necessary excavations and prepare

the proper certificate for record. It would be difficult to lay down any rules to distinguish a speculative location from one made in good faith with a purpose to make excavations, and ascertain the character of the lode or vein, so as to determine whether it will justify the expenditures required to extract the metal; but a jury from the vicinity of the claim will seldom err in their conclusions on the subject."

When Justice Field distinguishes a mere speculative or fraudulent posting of a notice where there is no mineral or indications of the same from a location made in good faith, he is far from holding or intimating that it is the law that the miner must find a paying mine before he can locate a claim.

As to *Territory* v. *Mackey*, 8 Mont. 168, which respondent seems to consider interesting in this connection, I am of opinion that a reading of that case, and the facts, render any discussion of it wholly a work of supererogation.

It is perfectly apparent, from our examination of the decisions of the United States Supreme Court, that we may state one proposition positively; that is, that that court has never yet held, as did the court below in the case at bar, that, in order to entitle one to locate a mining claim upon the public domain of the United States, he must first discover a vein or lode containing rock bearing known mineral deposits of such richness as to justify work to extract them. But do the decisions of that court necessarily, or at all, imply that doctrine? The advocates of the view of the law as declared by the District Court can detach from the opinions of Mr. Justice Field certain expressions, and upon them frame an argument. We refer to his expressions above cited in reference to minerals of such richness as to pay for the labor of exploitation or the raising to the surface. But these expressions were used, in every instance, in discussing what the mineral character of the ground should appear to be at the time of the grant by the government of the land, for purposes other than those of a mine, in order to except the alleged mineral land from such grant for such other purposes.

"There must be some point of time when the character of the land must be *finally* determined, and there can be no better point to determine this question than at the time of issuing

patent." (*Davis* v. *Weibbold*, 139 U. S. 521.)   In these words
of Judge Sawyer, cited by Justice Field, is the gist of the dis-
cussion.   The character of the land *finally* determined; *finally
determined at the date of the grant.*   Why?   In order that the
government may know that it is issuing a mineral patent for
mineral land, or an agricultural patent for agricultural land.
Not the character of the land finally determined at the moment
that the miner strikes his pick into the grass roots.

There may be a vast difference between mineral ground which
is valuable for exploitation and that which appears to be valu-
able for exploration.   There are immense tracts which, appear
to the miner to be valuable for the latter purpose, and a large
portion of which develops to be valueless for the former.   This
is evidenced by the honeycombed and deserted mountains
throughout the mining regions, where toil and wealth have
been expended on leads which once attracted the miner's explo-
ration, but where the sound of the pick and the drill is long
since stilled.   And it is just this fact that has made and will
make the mines; the ever present and alluring appearance of
value, and the occasional reward of development.   Without
prospecting, there will be no discovered mines.   Without the
privilege to claim and locate and hold a discovery, there will
be no prospecting.   A prospect not once in one hundred times
is a mine in sight.   If the locator must show a paying mine
at location, the riches in these mountains are a locked treasury.

The law does not contemplate this.   The mineral lands are
open for two purposes — for exploration and for purchase.
Exploration precedes purchase.   It opens the way for purchase.
Without exploration, purchase would be rare.   A miner would
desire to purchase the mineral lands at once, if they at once
appeared to be of sufficient value to pay to work.   He would
desire to explore them, if they seemed sufficiently valuable to
attract exploration.   It is a rare claim that is a mine at the
grass roots, or where the paying vein is first found at or near
the surface.   The history of the mining countries has shown
that, in the vast majority of cases, years of toil and thousands
of dollars have been required to demonstrate that a mineral
vein will pay to work.   And in many of them, even after years
of immense production, when dead work, prospecting, and de-

velopment is offset against output, whether they have paid to work is a doubtful proposition. Must the miner await large development and tremendous expenditure before he can take the first steps, by locating and recording, to secure to himself the right of possession, and of a grant from the government, when the great mine is developed? I think not.

Again, the government will not issue a patent for a mine at once upon discovery, no matter how valuable it then appears and actually is. It requires, first, the expenditure of five hundred dollars in improvement and development. For what purpose? In order to demonstrate that the claim is of that character that the government will grant the ground as a mine.

Before the mining acts of Congress, the miner was a trespasser upon the public domain. The acts of Congress gave him rights upon the mineral lands. The object of the requirement of the expenditure of one hundred dollars annually before the issuance of patent, and of five hundred dollars in the aggregate before patent, was to develop the mines and demonstrate their character. If it were the ordinary nature of valuable mining claims to appear, upon the instant of discovery, to be of sufficient value to pay to work them, why make the requirements of these expenditures in development before the issuance of patent?

The whole spirit of the statutes, and the construction given by the learned tribunals that have considered them, is not that the prospector must find a paying mine before he can locate his claim. If it were, mining prospecting in these regions would suffer an instant and well-nigh total paralysis.

If the fear be suggested that speculative locations may take the public domain, we can do no better than adopt the language of Mr. Justice Field, cited above from *Erhardt* v. *Boaro*, 113 U. S. 536, which he concludes with the remark that "a jury from the vicinity of the claim will seldom err in their conclusions on the subject."

I feel an ample support in my views in the decisions of the United States Supreme Court.

" A valid location of a mining claim may be made whenever the prospector has discovered such indications of minerals that he is willing to spend his time and money in following in

expectation of finding ore." (*Harrington* v. *Chambers, supra,* Supreme Court of Utah.)   This language I do not feel that I can fully adopt.   It goes further than there is necessity for, or is required to sustain the views I hold.   If it were modified to say "in expectation of finding ore sufficiently valuable to work," the views of the learned justice would be nearer to the opinion that I hold.

But observe Judge Hallett's words cited above, where he says: "Nor is it necessary that the ore shall be of economical value for treatment;" and the language of the context.   (*Stevens* v. *Gill, supra.*)   "It is only necessary to discover a genuine mineral vein or lode, whether small or large, rich or poor, at the point of discovery."   (*North Noonday Min. Co.* v. *Orient Min. Co. supra.*)   "With well defined boundaries, very slight evidence of ore within such boundaries will prove the existence of the lode;' and the context.   (*Iron Silver Min. Co.* v. *Cheesman,* 116 U. S. 538.)   And in the language adopted by Mr. Justice Field, in speaking of a lode: "It is an alteration of the verb 'lead,' and whatever the miner could follow expecting to find ore was his 'lode.'   Some formation within which he could find ore, and out of which he could not expect to find ore, was his lode.   The terms 'lode star,' 'guiding star,' and 'north star' are of the same origin."

So that if the miner finds that which is a lode or vein within the approved definitions, containing valuable mineral deposits; if it is a vein of that character, and that which he can follow, as indicated — a mineral lode, his guide, his star — he may claim it and locate it and hold it, without being required to show that, at the time of location, it contained mineral deposits of sufficient value to justify work to extract them.   As above remarked, how valuable the deposit must be to distinguish it from a speculative and fraudulent location we are not called upon to decide, but leave that matter as did Mr. Justice Field in *Erhardt* v. *Boaro.*

As far as I am aware the United States Supreme Court has not directly decided the proposition that has here been presented to us, and which we have endeavored to treat; but the conclusion that I reach is abundantly inferred from the utterances of

that court, and it is in accord with the spirit of the mining statutes, the history of mining development, and the geological facts of the mining regions.

Upon the conclusion of law by the District Court that I have discussed, I am of the opinion that the judgment of that court should be reversed, and the case remanded.

With these views I understand the majority of the court agree, but they place their decision upon the matter of the estoppel.

Upon that question I have to observe: The old Edna Claim (A, B, C, D) was located June 4, 1887, and recorded June 15, 1887. The new Edna, if I may so denominate it for the purpose of distinction (C, B, E, F), was marked upon the ground May 13, 1889, and its notice of location was recorded November 19, 1889. Between the old staking and record, in 1887, and the new in 1889, the Lightning was located and recorded July 7–17, 1888 (J, H, L, K). The old Edna and the Lightning were not in conflict. The new Edna and the Lightning were (G, H, I, F). If the Lightning location were valid, it prevails over the new Edna, as to the area in conflict, as it is a location senior to the new Edna. As hereinbefore concluded, the Lightning was not invalid, on the grounds assigned by the court. Whether it were invalid for other reasons — reasons within the law as I conceive it to be — we are not now required to say. But, on the grounds which the District Court adopted for holding the Lightning invalid, we must take the location of the Lightning, for the purposes of this discussion, as a valid one, and leave its validity or invalidity, whichever it may be, on other grounds, to be determined if a retrial of the case is had.

Now, on August 17th and 21st, Koegel and Nelson, plaintiffs, were owners in the Edna Claim, whatever the Edna was. They sold their interest in the Edna to the predecessors of the defendant. The court held that the plaintiffs were estopped by their deeds, which are described in my statement of the case above, from now setting up title to the ground in controversy (G, H, I, F). As to Shreve, I will speak below.

But were Koegel and Nelson estopped? In August, 1889, they conveyed to the defendant's predecessors their interests in the Edna. As the case is presented on this appeal the Light-

ning location was not invalid.  It was therefore valid, as the case now appears.  Then in August, 1889, the area in conflict (G, H, I, F) belonged to the Lightning and not to the Edna. Whatever may or may not have been the validity of the Edna's change of lines and new recording in 1889, it did not secure the area in conflict (G, H, I, F).  I pause again to make it fully understood that I speak of the validity of the Lightning location solely upon the ground upon which the District Court found it to be invalid.  I do not purport to give that claim any certificate of character, which may be presented on a retrial of this case, other than upon the lines by which the District Court found it to be invalid.  But to return.  Therefore Nelson and Koegel did not convey to the defendant's predecessors, in August, 1889, the area in conflict, by virtue of their deeds for their Edna interests.  They did not convey it, for the simple reason that they did not own it, and had no valid claim upon it—that is to say, remembering the view which the record compels us to take of the Lightning location—and it matters not to Koegel what Nelson testified his intention was.  But of this below.  So I conclude that the plaintiffs, Nelson and Koegel, did not convey to the predecessors of defendant any title to the premises in controversy by the deeds of August 17–21, 1889.

But respondent invokes the statute (Comp. Stats. div. 5), as follows: "Sec. 267.  Li any person convey any real estate by conveyance purporting to convey the same in fee-simple absolute, and shall not, at the time of such conveyance, have the legal estate in such real estate, but shall afterwards acquire the same, the legal estate subsequently acquired shall immediately pass to the grantee, and such conveyance shall be valid as if such legal estate had been in the grantor at the time of the conveyance."

.One of the requisites of the application of this statute is that the grantor's conveyance shall "purport to convey" the premises, in which he has not then, but afterwards acquires, the legal estate.  Did Nelson and Koegel's deeds "purport to convey" the area in conflict?  Those deeds conveyed the Edna claim as described in the notice of location thereof, which was recorded. This recorded notice was put in evidence.  It showed the claim located June 4, 1887, and recorded June 15, 1887.  It is clear

that, as so located and recorded June 4–15, 1887, the description upon the ground is that which we have called the "Old Edna" (Fig. A, B, C, D). As so located and recorded, and by reference thereto in the description in the deeds, Nelson and Koegel conveyed it. As so located and recorded it did not include the premises in controversy. Therefore, as so conveyed and described in the conveyance by reference to the location and record, the deeds did not "purport to convey" the area in conflict. And therefore, furthermore, as the grantors did not have a claim upon such premises, the fact that they afterwards acquired a wholly independent title to the ground does not bring their conveyance to the grantors of the defendant within the operation of the statute (§ 267) cited; nor were they estopped by their deeds independent of the statute. (*Meyendorf* v. *Frohner*, 3 Mont. 282.)

But Nelson demands a little further attention, as the estoppel as to him presents itself in another phase. Although he did not convey, nor did his deed purport to convey, the area in conflict, has he done that which now forbids him to say that he did not convey it; that is to say, is he estopped by his acts, wholly independently of the operation of the statute? It may be observed that Nelson knew of the swing of the Edna to the south, and assisted in making it. This does not appear to be the fact as to Koegel, so the acts and knowledge of Nelson which were sought to be applied to estop him do not exist as to Koegel.

There were three plaintiffs, Nelson, Koegel, and Shreve. One firm of counsel appeared for them all. Nelson alone testified on the trial that he intended to convey in his Edna deed of August, 1889, all his interest in the area in conflict, believing that the record of the Edna, originally made, and subsisting at the date of the said conveyance, included the said area in conflict. But as to Koegel. Nelson's testimony, whether competent or not, did not disclose that Koegel, by his Edna deed, intended to convey his interest in the area in conflict; nor does it at all appear anywhere in the case that Koegel intended to convey anything but that which his deed purports to convey; and as his deed does not convey, or purport to convey, the area in conflict, he is left standing upon the face of his deed, and

thereby he is not estopped, by reason of the considerations above expressed.

Having eliminated Koegel from the operation of the estoppel claimed, I return to Nelson. He joined with his co-plaintiffs in the action. His attorneys were the same as theirs. But upon the trial he deserts the position of hostility to the defendant, which he occupied on the record by virtue of being a plaintiff, and appears as a witness for the defendant, and favorable to the defendant, and adverse to his own interests as a plaintiff. If he chose to go upon the stand, and testify the truth (and, for all that appears, what he said was the truth), and such truth is an advantage to defendant, and adverse to the plaintiff witness, that was an act of honesty as commendable as it is not wholly uniform in human affairs, and an act which will call from this court no adverse criticism.

But here is the peculiar position: Plaintiffs' counsel are plaintiffs' and witness Nelson's counsel. He offers to testify that when he made his Edna deed he intended to convey the area in conflict. His counsel objects. He insists. As he himself was personally present in court, and personally offered to give this testimony, his counsel objecting to it, it must be that, whatever authority his counsel originally had to represent him, his conduct at this moment was a revocation of such authority in this particular. He had a right to revoke such authority. His conduct was certainly a revocation of his counsel's authority to object to the testimony that he desired to give. Therefore it must be that Nelson gave this testimony voluntarily and without objection. Defendant did not object to it. It was in its favor, and material to its case. Plaintiff Nelson did not object to it, as he personally insisted upon giving it. No valid objection could be made by plaintiffs, Shreve and Koegel, as it did not injure or prejudice them in any way, and was wholly immaterial to their interests. Therefore, from the point of view that we now occupy, the evidence went in without objection or exception. Now, in what position has Mr. Nelson placed himself? It is one entirely creditable to his honor and integrity. He thought that by virtue of his Edna interest, in August, 1889, he owned an interest in the area in conflict. He represented that he did. He intended to convey that supposed

interest. He thought that he had conveyed it. He received a consideration for it. To withdraw from the position that he assumed when he made the conveyance would now be to the injury of his grantees or their successors. And he does not even wish to so withdraw. He does not claim that he is not estopped. By his own testimony, he admits that he is. Then let him be estopped, as the facts seem to warrant the application of that doctrine. I am of opinion that the District Court was correct in holding that Nelson was estopped.

Therefore Nelson was estopped and Koegel was not. Now, as to Shreve. The evidence is unquestioned that Shreve derived his title in the Lightning Claim from the locators of that claim, and that Koegel and Nelson were not grantors of Shreve in the Lightning title. But, notwithstanding this, the court found that Shreve derived his title from Nelson and Koegel. This finding is not attacked. We cannot understand how the court found it, under the evidence, but it is not our province to make findings, nor to upset those that are unchallenged; and here is a finding which is not objected to, and at which no specification is pointed. It is therefore the fact, for the purposes of this review, that Nelson and Koegel were Shreve's grantors. If Nelson and Koegel are estopped, it is sought to extend that estoppel to their grantee, Shreve. But, as I have above endeavored to set forth, I am of opinion that Nelson was estopped and Koegel was not. Nothing informs me what fractional interest in the Lightning Claim Shreve received from Nelson, or what from Koegel. If it be contended that Shreve is estopped as to his interest received from Nelson, who was estopped, I do not know that it will be urged that Shreve was estopped as to his interest that he received from Koegel, his grantor, who was not estopped. There is not enough light in the case to inform me either as to the facts or the contention of counsel on this point, and, as I am of opinion that the case should be sent back for a new trial upon the considerations already expressed, I record no further views upon the point at which I have arrived.

One more matter I must advert to. It is urged by respondent that Koegel's and Nelson's deeds contain the further covenant that it is intended to convey the title to the premises

which may hereafter be acquired by virtue of the issuance of a United States patent upon proceedings theretofore instituted for the same. Very well. The grantors covenant that they intend to convey the title which shall come by patent from the United States. The title to what? The title to that which they presently convey and purport to convey; that is, the Edna Claim as they described it by reference to the location and record thereof, which record and location did not include the ground in controversy. What I have said above fully expresses the views that I venture to entertain upon that point.

I am of the opinion that the judgment should be reversed, and the cause remanded.