COOK et al. v. JOHNSON et al.

(Third Division. Fairbanks. May 21, 1908.)

No. 789.

1. MINES AND MINERALS (§ 38*)—DETERMINATION OF RIGHTS—ACTION.

In an action of this character plaintiffs must recover on the strength of their own title, and not upon the weakness of that of their adversary. Where both plaintiffs and defendants claim under separate placer mining locations, the plaintiffs, to recover in ejectment, must establish their location to have been a prior valid location.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 871½; Dec. Dig. § 38.*]

2. MINES AND MINERALS (§ 27*)—CONFLICTING LOCATIONS—PRIORITIES.

The cardinal principle which governs the conflicting claims of appropriators of mining claims and other rights on the public domain is that, other things being equal, the prior locator prevails.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 64, 65; Dec. Dig. § 27.*]

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

3. MINES AND MINERALS (§ 17*)—PLACER MINES—DISCOVERY.

No location of placer mining ground becomes valid until a discovery of mineral has been made within the limits of the claim.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24–28; Dec. Dig. § 17.*]

4. MINES AND MINERALS (§§ 17, 38*)—DEFINITION OF "DISCOVERY."

Where minerals have been found, and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success in developing a valuable mine, the requirements of the statute have been met, and a "discovery" made. Whether or not the discovery is sufficient to justify further expenditure is in every case a question of fact, to be determined by the court or jury.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24–28; Dec. Dig. §§ 17, 38.*]

5. MINES AND MINERALS (§ 51*)—PLACER MINES—TRESPASS.

It is not essential that the owners of a placer mining claim should be in the actual foot possession of the ground to enable them to hold it against the entry by others. Evidences of their possession, such as stakes, notice, brushed-out lines and cabin, are sufficient.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 51.*]

6. MINES AND MINERALS (§ 27*)—PLACER MINES—ENTRY—TRESPASS —CONFLICTING LOCATIONS.

Where the plaintiffs' entry upon the mining claim was initiated in trespass, upon ground already appropriated by a prior valid mineral location, their subsequent acts cannot avail them in establishing a right to the possession of the ground.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 27.*]

The plaintiffs bring this action in ejectment to recover a certain tract of placer ground, to wit, the upper 350 feet of the bench claim, first tier, opposite the upper 350 feet of creek claim No. 1 below discovery, right limit, of Dome creek, in

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

the Fairbanks recording district. Plaintiffs set up two causes of action. In each of them they allege their ownership in fee of the tract described, as against all persons save and except the United States. The first cause of action is based upon the allegation that the defendants have, since the 1st day of January, 1906, wrongfully and unlawfully withheld the possession of the premises from plaintiffs, to plaintiffs' damage in the sum of $20,000. In their second cause of action plaintiffs allege that on January 1, 1906, the defendants wrongfully and unlawfully entered upon the premises in question, and have ever since wrongfully and unlawfully withheld them from plaintiffs, and that since such entry, and during the year 1906, the defendants have, without the consent and against the protests of plaintiffs, carried on mining operations, and mined and extracted from the premises gold and gold dust to the value of $20,000, which they have wrongfully and unlawfully appropriated to their own use, to plaintiffs' damage. In their prayer, plaintiffs ask that they be declared to be the owners and entitled to the immediate and exclusive possession of the tract, and that they recover damages for the wrongful withholding of the property, and for the gold and gold dust taken and extracted therefrom, in the sum specified.

All three defendants appeared; Johnson and West by counsel, and John Vinney in person. Two separate answers were interposed. That of the defendants Johnson and West, answering the first cause of action, denies the plaintiffs' allegations of ownership, and admits that they have, since January 1, 1906, been in possession of the premises in question. It is denied that such possession is wrongful or unlawful, or that possession has been withheld wrongfully or unlawfully, or that plaintiffs have been damaged at all thereby.

The nature of the defendants' alleged rights therein is then set up in detail as an affirmative defense. Briefly stated, they allege the fact to be that on and prior to March 24, 1905,

Edward Burke and Gust. Juntilla were, subject to the paramount title of the United States, the owners, in the possession, and entitled to the possession of the placer mining claim known as No. 1 below discovery, first tier, right limit, of Dome creek, of which claim the property in controversy is the upstream 350 feet; that Burke and Juntilla, and their successors and grantees, have been such owners and possessors ever since; that on September 16, 1905, Burke and Juntilla executed to these defendants a lay, or mining lease, upon the ground in controversy for the term of three years; that defendants have been ever since, and now are, the owners of such leasehold interest; that such lease is still in full force and effect; and that they are now the tenants in possession of H. J. Miller and F. De Journel of an undivided one-half of the premises, and of Edward Burke and Gust. Juntilla, or their successors and grantees, for the other one-half interest.

Answering plaintiffs' second cause of action, Johnson and West specifically deny the plaintiffs' allegations of ownership, possession, and right of possession, and, while they admit the allegations of their entry upon the lands and of their having conducted mining operations thereon and having extracted gold and gold dust therefrom, they deny that the gold and gold dust extracted amounted in value to $20,000, but allege the values taken to be about $10,000. That the mineral was wrongfully and unlawfully converted and appropriated to their own use, or that they thereby damaged plaintiffs, is also specifically denied. For an affirmative answer to the second cause of action, they reiterate the allegations interposed to the first cause of action, and make the prayer usual in such actions.

The plaintiffs, in their reply, deny every affirmative allegation of the answer.

A close scrutiny of the separate answer of the defendant Vinney is not essential. It is sufficient to say that he, upon information and belief, interposes the same denials, makes the

same allegations, and sets up the same affirmative defenses as do Johnson and West. The only important new allegations are: First, an allegation upon information and belief that Miller and De Journel are the grantees in a duly signed, executed, and acknowledged deed of an undivided one-half of the ground from Burke and Juntilla; and, second, as disclosing his interest in the premises, he sets up that between Johnson and West and himself there is an existing written contract by virtue of which he, under certain stipulated conditions, should with Johnson and West share and share alike in all matters pertaining to the premises, to all of which Burke and Juntilla had consented and given their approval. These new allegations go to the first cause of action. To the second, the only new matter which he sets up is that the value of the gold mined and extracted approximates $8,000. He makes in substance the same prayer as the other defendants, except that he asks that he be included with Johnson and West as being entitled to the possession of the premises. The affirmative allegations of this answer are denied in the reply. No evidence was introduced by Vinney in support of his answer, nor did plaintiffs offer any on the subject.

On stipulation, a jury was waived, and the case was tried by the court. At the conclusion of the plaintiffs' case, the defendants moved a nonsuit. This motion was denied, without prejudice to a renewal at the close of the trial of such part of it as the defendants might deem proper. Defendants did not, however, renew their motion for a nonsuit. Consequently, the questions raised by that motion are eliminated at this time. Counsel, at the close of the evidence, entered into the following stipulation:

"It is hereby stipulated and agreed by and between the plaintiffs and defendants in the above-entitled cause, by and through their respective attorneys, that when the court shall go to Dome creek to view the premises in controversy in the above-entitled action, and in the vicinity thereof, that the court shall be accompanied, in addition

to the attorneys, by two other persons to do the panning, one of whom shall be selected by the plaintiffs and one by the defendants, and that said persons shall pan upon the ground and in the material as the court may direct; and said parties hereby waive any error that may be predicated by what may be done by virtue of this stipulation.

Heilig & Tozier,

"McGinn & Sullivan,

"Attorneys for Plaintiffs.

"F. De Journel,

"John K. Brown,

"Henry Roden,

"Attorneys for Defendants."

Pursuant to that stipulation, and in compliance with the request of counsel made at the time of the filing of the stipulation, the court viewed the premises and directed certain panning thereon.

McGinn & Sullivan and Heilig & Tozier, for plaintiffs.

F. De Journel, John K. Brown, H. J. Miller, and Henry Roden, for defendants Johnson and West.

John Vinney, pro se.

GUNNISON, District Judge. The principal question in this case is as to who made the prior valid location; plaintiffs contending that they were the first to locate the ground in conformity with the law, while the defendants assert that, when the plaintiffs made their entry, the ground was covered by a prior valid placer mining location made by the defendants' lessors. Inherent in this question is the further question, which, in my opinion, is determinative of this litigation, as to whether or not defendants' lessors made a valid discovery of gold. There are, of course, many other questions, both of fact and of law, in the case; but these are collateral to that main and vital question. Most of the evidence adduced on the trial was aimed at this question of discovery, and the major part of the most

excellent and carefully prepared briefs of counsel is devoted to a discussion of the evidence and the law upon that subject. These briefs prepared by the counsel, whose legal erudition and skill are well known, have been of great assistance and value to the court in its consideration of the voluminous evidence and the law upon the subject.

The examination of the evidence will be directed particularly to those portions which throw light upon the acts of Edward Burke and Gust. Juntilla, under whom defendants claim. It should, however, at the outset be remembered that both Burke and Juntilla had, prior to the commencement of the trial of this action, sold their several interests in the ground, and had at that time no interest whatever in the outcome of the action, as this fact has a strong bearing upon the weight to be given to their testimony.

Edward Burke was the first person to stake the ground in controversy. He was a miner and prospector, and had had experience in the mining camps in the Upper Yukon country. His acquaintance with the vicinity that now constitutes the Fairbanks mining district began early in February, 1903. After spending a fortnight on Pedro and Flume creeks, he went, on February 12th, over to Dome creek for the purpose of staking vacant ground, carrying with him an ax, a lunch, and a lead pencil. At the time the ground was covered with snow to the depth of about four feet; but, despite the snow, he set his six stakes, the initial stake being on the upstream end of the claim. This stake was the stump of a tree, the top of which he cut off. He blazed the stump, or stake, and on this blazed surface he inscribed with his pencil the location notice. The man's limited knowledge of the English language and his evident inability to express himself therein when on the witness stand make it difficult to determine the exact phraseology of the notice. From his evidence it appears that some one had prepared a form of a location notice, and that he had this with

him and copied parts of it on the initial stake. He testifies that he wrote on the stake:

"One Below Dome Creek, Side Claim. Twenty acres placer mining claim. 12th of February, 1903. Location Notice.

"Ed. Burke."

As this was obtained only after much questioning, it is impossible to give the order in which the several phrases, the date, etc., were arranged in the notice.

In addition to staking the ground and writing on the initial stake and the corner posts, he brushed out the lines so that he could stand at one of the corners and see the stake at the other corner of the claim on the same side, and the other corner and center stake on the end where he stood. This work he completed on February 13th, the next day, and went back to Pedro creek. Soon after he returned to Circle. At his request and under his direction, the recorder prepared a notice of location for this claim. This notice, which Burke signed, was recorded, and a certified copy of it is in evidence (Defendants' Exhibit L). The recorded notice is as follows:

"Notice of Location.

"District of Alaska, Third Judicial Division, Circle Recording District—ss.:

"Notice is hereby given that the undersigned, having complied with the regulations of chapter 6 of title 32 of the Revised Statutes of the United States, and local customs, laws, and regulations, has located 20 acres of placer mining ground situated in the Fairbanks mining district of Alaska, described as follows, to-wit: Claim #1 below discovery, right limit, side claim, on Dome creek, 1,320 by 660 feet. This notice is posted on the upper center stake of said claim.

"Ed. Burke, Locator.

"Discovered Feb. 12, A. D., 1903.

"Located Feb. 12, 1903.

"Filed for record April 15, 1903, at 3:05 p. m.

"Charles Ethelbert Claypool,

"Commissioner and Ex Officio Recorder.

"Page 479, Transcribed Vol. 1."

3 A.R.—33

At the time Burke went upon this ground, it was a part of the public domain, vacant, unappropriated, and unoccupied. He returned to that vicinity from Circle late in the year, and remained there until the fall of 1904; but he personally never did any other work than that already indicated on the claim.

Gust. Juntilla's connection with the claim dates from August, 1904, shortly after he arrived at Cleary creek from Circle. He had been a miner and prospector since 1900, the great part of the time in the vicinity of Dawson, Y. T., though he had prospected about Eagle. On August 18th Juntilla reached Cleary creek, and there the next day he met Edward Burke for the first time. On this occasion the men talked about the Dome creek ground staked by Burke the preceding year. Their discussion was resumed on the following day, August 20th. The result was an oral agreement with reference to the claim. On the examination of Juntilla, it at first appeared, in response to questions propounded by plaintiffs for the purpose of framing an objection, that the provisions of this oral agreement were all contained in a written agreement (Defendants' Exhibit C), made subsequently. However, on further examination by defendants, Juntilla testified, and in this he is corroborated by Burke, that the written agreement (Defendants' Exhibit C) did not contain all the provisions of the oral understanding between them. Among the matters omitted from the written contract was the agreement that Juntilla was to measure the claim, and also that he was to pan in the draws, or water courses, that cross the ground. Immediately following these talks of August 19th and 20th, Juntilla went to Fairbanks, where he examined the records with reference to the Burke claim. Since the Burke notice had been recorded at Circle, a new recording district had been established, embracing Dome and the other creeks in that vicinity; the recording office for the new district being at Fairbanks, to which office the early records were transferred. After inspect-

ing the record, Juntilla, accompanied by one Victor Hjort, went to Dome creek on August 26th, carrying a tape line, an ax, and a lunch, consisting of bread and two cans of roast meat.

At this point it is appropriate to consider the character and appearance of the country and of the ground, and the progress made in mining operations on Dome and other creeks in that vicinity at that time, as bearing upon the subsequent acts of Juntilla and the others connected with this case. A considerable portion of the trial was occupied with the examination of witnesses upon these matters, particularly as to the situation observable and known in August, 1904, when Juntilla went to Dome creek.

The ground in controversy lies about the center, both in length and width, of a wide valley, known as Dome creek valley, and upon the right limit of the creek itself, some 16 miles from Fairbanks. The country for many miles about consists of high rounding hills, from which long, rolling ridges extend, and the valleys or wide gulches which these ridges divide have gently sloping sides; the country being rolling, not rugged or rocky. In August, 1904, it was covered with a growth of small timber and brush. The surface of hill and valley, save where the water courses had made their beds, was carpeted with thick moss and rufted grass. Through the bottom of each valley flows a stream or creek, having its rise in the hill at the valley's head. The flow of water in these creeks is augmented by smaller creeks and by numerous rivulets that during the summer come down from the ridges in little gullies, or, as they are there locally known, "draws." The hill at the head of the valley in which the premises in controversy are located bears the descriptive name of "Pedro's Dome," which name is borne as well by the valley and the large creek finding its source there. In the Dome two other creeks, Cleary and Pedro, rise. Each of the three leaves the Dome in a different direction, through a different valley.

At the time in question mining operations were being carried on in Cleary and Pedro; but Dome creek was an unknown quantity as a mining proposition. Pedro was a fairly narrow valley. Where mining operations were not being carried on, the surface was covered with the light timber, brush, and moss; but the depth to bed rock was not great, it being but a few feet below the surface. Sand, loam, and wash gravel were exposed at the surface, and the pay streak lay in the bed of the creek, except on 6 below, where it entered the right limit, returning again to the bed of the creek in the next claim.

Cleary creek, on which Juntilla spent the 18th, 19th, and 20th of August, was a wider and longer valley than Pedro. There a thick growth of small timber and brush was growing, except where the ground had been cleared for mining operations. The surface covering, save in the bed of the creek, was moss. Immediately below the moss lay a material called by the miners of the district "muck." Bed rock was considerably deeper here than on Pedro; the strata of muck which overlies the gravel and bed rock being thick. Extensive mining operations were being carried on here. Such was the condition on these two creeks when Juntilla went to Dome.

If he had not personally examined the shafts and the conditions below the surface, it is probable and fair to presume that, during a three days' stay on Cleary and his subsequent trip to Fairbanks and back to Dome, he had accumulated some information as to the mining situation and subsurface conditions from the miners and prospectors whom he met. Being a miner and prospector himself, these matters were of paramount importance to him, and, though there is no evidence that he accumulated information in this way, it would be contrary to human experience to presume that during all that time he had gone about among the miners on the creeks and in town without learning something of conditions. As already stated, Dome creek was an unknown quantity as a mining proposi-

tion. The valley was much wider than either Cleary or Pedro, and the creek was longer. Small timber, brush, moss, and grass covered the surface everywhere but in the creek bed. So far as is disclosed by the evidence, bed rock had not been reached, and the depth to bed rock was unknown; nor was it known whether or not the valley contained a pay streak. Where water courses running down the sides of the valley had cut through the turf on the surface, muck was exposed. Therefore, though the superficial characteristics of Dome and Pedro were dissimilar in almost every respect, the same cannot be said with respect to Dome and Cleary. In fact, it appears from the evidence that there was a decided similarity of the surface appearances of the two latter valleys. This, then, was the situation when Juntilla and Hjort reached the Burke ground on August 26, 1904.

After the two men had measured the claim, Juntilla took one of the roast meat cans, from which the meat had been taken, and went to the draw that crossed the upper end of the claim. The coating of grease which is left in one of these roast meat cans is difficult to remove, and to clean it Juntilla testifies that he scoured it with cold water, moss, and sand which he found in the draw. There was some difference of opinion among the witnesses as to whether, in the first place, the can, which was about six inches in diameter and an inch and a half deep, could be cleansed so as to make it useful for panning; and, second, whether, having once cleansed it, gold could be saved in it. Most of those witnesses who were examined on that subject, though some did so grudgingly, conceded that it could be cleansed, and that gold could be saved in it if it were sufficiently cleansed. Having scoured the pan, Juntilla proceeded to pan in it the material he found in the bottom of the draw, which at its deepest point is from 10 to 15 feet below the surface of the claim, and some 15 to 20 feet wide from bank to bank, at the surface. He worked at this

panning for an hour and a half, taking in all from 10 to 15 cans of the material, which, calculating from a demonstration made on the trial with a similar meat can and a miner's pan, would have equaled a little over one ordinary miner's pan of dirt. These several cans of dirt were, however, taken from various points along the bottom of the draw. The result of the panning was a large number of colors of gold; Juntilla estimating the number to be from 60 to 100. A careful scrutiny of his evidence shows that this is a mere estimate; for he says that he did not count them, and that he is not certain of the number of cans of dirt taken. It is not contended by the defendants that this panning was done in gravel, nor near the gravel overlying bed rock. Between the bottom of the draw, where Juntilla panned, and the gravels upon bed rock, lay from 50 to 60 feet of so-called muck. A great difference of opinion existed between the expert miners sworn as to what this "muck" really was. A sample of the material taken from the side of a draw on the ground was submitted to a metallurgical chemist to be assayed. The report of the assayer, filed in the case, shows it to be as follows:

"Gustave Beraud, being first duly sworn, on oath deposes and says:

"I am the assayer and metallurgical chemist to whom a sample of the alluvial deposit was given by the clerk of this court to be assayed by me in the above-entitled cause, in which I gave testimony, and I find said dirt or alluvial deposit to be of the following composition:

Moisture ........................................ 26.07%
Volatile and combustible matter, which includes all
    vegetable matter............................... 4.20%
Incombustible matter, which includes silica, quartz,
    alluvial sand, mica schist, iron, magnesia, and cal-
    cium ........................................ 69.73%

"Gustave E. Beraud.

"Subscribed and sworn to before me this 20th day of September, 1907.

"[Notary Seal.]                    .    Henry Roden,
       "Notary Public in and for the Territory of Alaska."

This disposes of the theory of plaintiffs that the overburden is real vegetable muck. But the assay does not dispose of the plaintiffs' contention that this muck does not carry gold. Both sides were prepared to offer a large number of expert witnesses on the question as to whether or not gold or colors could be found in or on this muck. At the opening of the trial the court notified counsel that each side would be allowed but five experts. Some of the plaintiffs' experts called testified flatly that gold could not be found in or on this muck; that it would not hold or carry gold. Despite this, however, colors of gold were found in the draw by several witnesses, and were panned out in the presence of the court from points in the upper draw indicated by the court, on the occasion of the view of the premises. On this latter occasion, some 40 pans were taken at 16 points on the upper draw. At two of these points, an aggregate of 40 colors were found; 38 colors being taken at one point as the result of 5 pans, and 2 colors at the second point were found in a single pan. The sand and other material, principally muck and sediment, in which these colors were found, was taken from the very edge of the water in the bottom of both the upper and lower draws, and on the surface of the ground at a distance from both draws; but no colors were found in any of those places.

It is clear to me from the evidence, the assay of the sample of muck, and from my observation on the ground, that the experts were correct when they testified that "muck" does not contain gold and is totally valueless as a mining proposition. But, while this is true, it does not follow that water coming down from the hills may not and does not wash gold and colors down through the draws and deposit it along the beds of the draws. That I believe to be the explanation of the appearance of the gold in the upper draw. An attempt was made to prove that Juntilla "salted" that draw in the spring of 1906; but this, in my opinion, failed, as I believe the witness Hjort to be

unreliable, to characterize it mildly. I am satisfied that Juntilla found gold and colors in the upper draw in August, 1904, in considerable numbers, though probably not to the number of 100, as I have already pointed out that Juntilla was estimating when he testified as to the number panned out. But it must be patent to one acquainted with the geological conditions existing in that country that the colors found upon the surface, under conditions or at a place such as that in which Juntilla found them, or as they were panned in the presence of the court, can be no definite indication that there is pay on bed rock, or that the pay streak, if there, lies at any certain point. It could be nothing more than an evidence that the creek is within a mineral belt, and that somewhere in the vicinity gold is to be found. The sufficiency of this as a valid discovery will be considered hereafter.

Juntilla did nothing more on the claim at this time. He had measured the claim, and had seen Burke's stakes and notice, and had panned on the ground in the manner and with the result as we have seen. He went back to Cleary, saw Burke, and told him what he had done, and that he had found gold there.

Plaintiffs in their brief called the court's attention to certain testimony given by Burke in a deposition taken in the case of Cook v. Klonos, No. 278, where the same ground was involved. They assert that this not only impeaches Burke's testimony as to directing Juntilla to pan on the ground, but that it negatives defendants' contention that Burke adopted the asserted Juntilla discovery. The few questions and answers offered by plaintiffs might lead one to take their view; but when the balance of Burke's testimony upon that subject, which defendants introduced, is examined, it is clear that plaintiffs' contention is not supported by the evidence. The evidence mentioned is as follows:

"Q. Now, did you ever discover gold upon this property yourself?
"A. No, sir.

"Q. Did any one ever discover it for you?

"A. No; not before me.

"Q. Did anybody ever discover it for you?

"A. No; not that I know of.

"Q. Do you know whether or not Gus Juntilla ever discovered gold?

"A. He said he did.

"Q. Where did he say he discovered it?

"A. That draw that goes across the claim, he said he found it there.

"Q. How much gold did he say he found?

"A. Several colors.

"Q. How many pans did he say he panned?

"A. He said he panned several pans. As he had no gold pan, he used a beef can.

"Q. He said he found several colors?

"A. Yes, sir.

"Q. Did he tell you how many of these kind of pans he had washed upon the property?

"A. No; he did'nt tell me how many. He said several pans.

"Q. When did he tell you he found that there?

"A. The late part of August, 1904.

"Q. Is that the time he told you about it?

"A. Yes, sir.

"Q. That was before you went away?

"A. Yes."

A few days later, on September 10th, Burke and Juntilla entered into the written agreement to which reference has already been made. This agreement, in evidence as Defendants' Exhibit C, is as follows:

"Fairbanks, Alaska, September 10, 1904.

"Articles of Agreement.

"Edward Burke, party of the first part, agrees to deliver to Gus Juntilla, party of the second part, one undivided one-half interest on said claim, right limit, number one below discovery, Dome creek. Party of the second part agrees to put the shaft to bed rock before the 30th day of April, 1905; also to perform the necessary rep-

resentation work for the year 1904. Said work to be done before the 31st day of December, 1904.

"Witness:                     Party of the First Part,

     "J. Monk.                 . . . . . . . . . . . .

                              "Party of the Second Part,

                                 "Gus Juntilla."

This agreement was drawn up in duplicate by a miner named Joe Monk. Juntilla signed one of the duplicates, that given above, and delivered it to Burke. Burke signed the other, and handed that one to Juntilla, who later filed it for record at Fairbanks. Burke then left for the "outside," and on September 14th Juntilla went out to Dome creek again. On this trip he did nothing more than to pan in the lower draw with the same roast meat can, which he found where he had left it. This panning resulted in only two or three colors. It was on December 19th that Juntilla next went to the claim, this time prepared to do the assessment work. He went over the boundaries, chopping out some 300 feet of the line on the north side near the upstream end of the claim. Having cleared up the lines, he proceeded to build a cabin on the ground. This he constructed of logs obtained in the vicinity. The dimensions of the cabin were 12 by 12 by 7 feet, with a shed roof; the roof material being dirt which was taken from a point at which Juntilla testifies he intended to sink the shaft. The floor was of boards. The door and some of the materials used he obtained on 5 below Dome. The valuation put on the cabin by Juntilla on his examination was $125. On January 7, 1905, he went over to Cleary, leaving in the cabin, which was then completed, his pick and shovel and some pieces of stove pipe. Some five weeks later, on February 17th or 18th, he came back, got his tools, and returned to Cleary. Up to this time no one had disturbed his and Burke's possession of the ground.

In the latter part of March, 1905, the situation changed. J. C. Ridenour and Henry Cook, two of the plaintiffs, arrived at Dome creek on the 22d of that month. Ridenour at once

moved into the cabin built by Juntilla, though he did not at that time know to whom it belonged. When asked on cross-examination, "Did you find the cabin door fastened when you tried to enter into it? he answered, "I don't remember whether it was fastened or not." He saw indications that the cabin had recently been occupied; chips lying about on the snow, where some one had been chopping firewood. On March 23d and 24th, he staked the Dome group association claim, which included within its bounds the ground in controversy, and posted on his initial stake a typewritten notice containing the locators' names. This notice, save for the distances and directions from stake to stake, had been prepared and sent out to him by E. T. Barnette. Ridenour admits that at this time he observed claim stakes set and a location notice posted upon the ground, and that this indicated to him that the ground had already been staked when he went on it.

After staking this association claim, and without doing any prospecting other than to observe the lay of the land, he started upon that part of it which lay within the lines of the Burke claim a shaft known in this action as "No. 1." On April 15th, he found, in about 10 feet of gravel, four or five colors of gold. These were the first found on or in the ground by plaintiffs. On April 17th plaintiffs' notice of location was filed for record. They continued to bed rock, reaching it about May 18th or 20th, and, in sinking, penetrated 62 feet of muck and ice and 65 feet of gravel. Fine colors were found at various depths in the gravel and on bed rock. In one pan 25 colors were found. However, they failed to find the pay streak, and abandoned the shaft on June 7th or 8th, though Ridenour testified that the gold which he found on bed rock in this shaft justified the plaintiffs in spending further time and money in the expectation of developing a paying mine. The largest value which he got in a single pan in this shaft would, he testified, probably be worth a cent. There was nothing in

the shaft, nor on bed rock, that pointed definitely to the location of the pay streak; the character of the material on bed rock and the dip of bed rock itself being merely indicative of the general direction in which the prospector must look for the pay. But even from these indications it was impossible to determine that the pay lay within plaintiffs' lines. Their next shaft, No. 2, was sunk some 2,700 feet downstream from No. 1, reaching bed rock at a depth of about 128 feet, in the latter part of July. Gold in sufficient quantities to pay a man to work was found in this shaft; the pans running from 2 to 20 cents. After this a third and fourth shaft were sunk by plaintiffs; the fourth being again within the Burke lines.

Early in April, while plaintiffs were still engaged in sinking No. 1 shaft, Juntilla, accompanied by one Harrison, returned to the claim and found plaintiffs occupying his cabin, and in possession of the ground. At that time plaintiffs had on the ground a boiler, and were prosecuting their work in the shaft. Juntilla and Ridenour had a talk, in which the former asserted his claim to the cabin and the ground, and demanded possession, which was refused. Ridenour testifies that the talk was friendly, that he prepared a lunch for Juntilla and his companion, and that during the talk Juntilla asked him to buy the cabin. No valuation was placed upon it, however. He also testifies that he overheard a conversation between Juntilla and Harrison about the possibility of getting a boiler out to the claim and beating plaintiffs to bed rock, or in making a discovery. He does not remember definitely which expression was used. Other witnesses testified to conversations with Juntilla at various times shortly after this meeting, in which Juntilla offered to sell the cabin at a low figure, and in which he said that he had made no discovery. In each instance, however, it appeared on cross-examination that the talk about discovery was based upon the theory, then held by the miners of

that vicinity, that a discovery on bed rock was essential to a valid location.

Juntilla did nothing more at the claim at this time, and returned to Cleary. In June Burke returned from the "outside," and he and Burke made a second oral agreement, which was later merged in a written instrument (Defendants' Exhibit E), executed April 10, 1906, and by which Juntilla obtained a half interest in the ground. A mining lease bearing date September 16, 1905 (Defendants' Exhibit F), was then given to these defendants, Johnson and West, by Burke and Juntilla; the latter signing it some time after Burke had executed it. Under this lease the defendants went at once into possession. On December 19, 1905, the lessees began to sink their shaft, and about the 1st of the following April they reached bed rock. They continued mining on bed rock until enjoined in the case of Cook v. Klonos, No. 278. During that time they extracted some $10,000 of gold and gold dust from the ground. At the time of the commencement of this action the defendants were in possession of the ground under this lease, or lay agreement (Defendants' Exhibit F).

It is contended by defendants that the locators of the Dome group association claim, with the exception of Cook and Ridenour, were fictitious persons, and that the location of plaintiffs' claim is invalid for that reason. The evidence shows conclusively that these were not fictitious persons. E. T. Barnette is their attorney in fact. From his testimony, it appears that the powers of attorney (Plaintiffs' Exhibits Nos. 3 to 8) were executed to him in compliance with a suggestion or request made by him in a letter written some years ago to A. T. Armstrong, one of his principals and his brother-in-law. This letter was not in evidence; but from Barnette's testimony it appears that it was written in 1900, and that he wrote that he should expect a half interest in the interests of his principals in whatever property was staked under those powers. The

powers of attorney have not been revoked, nor has Barnette obtained the expected interest, or any part of it. Barnette, as attorney in fact under those powers, outfitted Cook and Ridenour, and later conveyed the additional interest to Cook and Ridenour, and the interest to McGinn and Sullivan, the plaintiffs' attorneys.

Neither plaintiffs nor defendants hold the legal title to the locus in quo from the United States. Consequently there is here involved only such right of possession as the United States recognizes in the locator of a valid mining claim. Plaintiffs bring this action under the Alaska Code to recover possession of the mineral ground described in the complaint. In an action of this character, plaintiffs must recover on the strength of their own title, and not upon the weakness of their adversary. Both plaintiffs and defendants claim under original locations, and, consequently, the senior valid location, if not abandoned or forfeited by the locators, will be protected.

"The cardinal principle which governs the conflicting claims of appropriators of mining claims and other rights on the public domain is that, other things being equal, the prior locator prevails." Conway v. Hart, 129 Cal. 480, 62 Pac. 44; Cosmos Exploration Co. v. Gray Eagle Oil Co., 112 Fed. 4, 20, 50 C. C. A. 79, 61 L. R. A. 230.

It therefore becomes a question as to which have the prior valid location, and plaintiffs, to recover, must establish their location to have been such. The first essential in the initiation of rights by an original placer location is that the ground upon which the location is made is "situated on the public domain"; i. e., that the ground is open, unoccupied land of the United States, and that it has not already been legally appropriated as mining ground by another.

Plaintiffs contend that there had been no valid location or appropriation of the land in controversy when they made their entry, and that they were the first to comply with the law in making a location. On the other hand, the defendants assert

that their predecessors, prior to plaintiffs' entry, had made a valid location, and that consequently plaintiffs could not legally initiate any rights thereon, and that plaintiffs were trespassers when they entered. It therefore becomes necessary to determine, first, the validity or invalidity of the location made by those under whom defendants claim, in order to ascertain what rights, if any, plaintiffs have in the premises.

Undeniably, Burke, one of the defendants' predecessors, was the first person to stake this ground. But plaintiffs contend that the recorded location notice of Burke (Defendants' Exhibit L) was indefinite and insufficient, in that the notice does not contain "such a description of the claim, * * * located by reference to some natural object or permanent monument, as will identify the claim." Section 2324, Rev. St. U. S. (U. S. Comp. St. 1901, p. 1426). There is nothing about this notice which would mislead or confuse a person honestly desiring to ascertain the location or size of the claim. On the contrary, it seems to be sufficiently definite for the purposes for which such a notice is required. 1 Lindley on Mines, § 381; 1 Snyder on Mines, § 368 et seq.; Bonanza Cons. Mining Co. v. Golden Head Mining Co., 29 Utah, 159, 80 Pac. 736; Zerres et al. v. Vanina (C. C.) 134 Fed. 610; Wells v. Davis, 22 Utah, 322, 62 Pac. 3; Walton v. Wild Goose Mining Co., 123 Fed. 209, 60 C. C. A. 155.

Not only was the recorded notice sufficient to indicate the place where the claim was staked, but the claim itself was properly staked and marked on the ground. I can see nothing in the acts of Burke, personally, so far as they went, in staking, posting, or recording, that are open to successful contest. But Burke did not in person, either before or after staking the ground, make a discovery; nor do the defendants claim that he did so. Their contention is that Juntilla, under an agreement with Burke to prospect the claim, made a discovery of gold for Burke, that Juntilla's discovery inured to Burke's

benefit, and that Burke adopted it. The plaintiffs assert that, even admitting for the sake of argument that Juntilla did make a discovery, the evidence does not support the defendants' claim that Burke authorized Juntilla to prospect on the surface, but that, on the contrary, a bed rock discovery was contemplated by both men, and, further, that the evidence which is quoted from Burke's deposition conclusively shows that he did not adopt Juntilla's alleged surface discovery. I cannot agree with plaintiffs' contentions upon this subject. In my opinion the defendants have established that on August 20, 1904, it was agreed between Burke and Juntilla that the latter should pan in the draws that cross the claim and see what he could find there; that Juntilla did pan in a roast beef can, found colors of gold, and when he returned to Cleary told Burke of what he had found; that Burke adopted it as his discovery, and, acting upon it as such, entered into the written agreement of September 10, 1904 (Defendants' Exhibit C) with Juntilla.

If the gold, or colors of gold, found by Juntilla, are sufficient in law to constitute a valid discovery, then Burke's location was perfected, since it is immaterial in what order the various acts constituting a valid location are performed, when, as in the case at bar, no rights of third parties have intervened before the final act which consummates the location. 1 Lindley, § 330; Jupiter Min. Co. v. Bodie Min. Co. (C. C.) 11 Fed. 666; Erwin v. Perego, 93 Fed. 608, 35 C. C. A. 482; Nevada Sierra Oil Co. v. Home Oil Co. (C. C.) 98 Fed. 677; Cosmos Exploration Co. v. Gray Eagle Oil Co., 112 Fed. 14, 50 C. C. A. 79, 61 L. R. A. 230; Erhardt v. Boaro, 113 U. S. 527, 534, 5 Sup. Ct. 560, 28 L. Ed. 1113.

But was Juntilla's discovery in the draw, under the conditions as they then existed, sufficient to constitute a discovery in the contemplation of law? This is undoubtedly the crucial question in the case. Since the acts of Burke and Juntilla, and

of Ridenour, under which the defendants and plaintiffs, respectively, claim the ground, and prior to the commencement of this action, mining operations on Dome creek and upon this particular ground have demonstrated that the pay streak lay within the lines of the Burke and Juntilla location, and that any person, prudent or imprudent, miner or office man, experienced or inexperienced, would have been justified in sinking holes within those lines. In this case, then, it is not necessary, as it was in Book v. Justice Min. Co. (C. C.) 58 Fed. 107, 128, that it be "determined by a court or jury whether a vein or lode" (or a pay streak) "has been discovered or exists within the limits of the particular claim or location in controversy." The pay streak was, when the trial began, known to be within the limits of the claim, so that it became purely a technical question as to whether, on August 27, 1904, under the then existing conditions, the finding of gold by Juntilla constituted a discovery sufficient in law. Before entering into a discussion of decisions on the subject of discovery, it will, I think, be well to again revert for a moment to the physical conditions as they exist in this mining district, so that there may be no misapprehension on that subject.

The composition of the so-called "muck" which overlies the gold-bearing gravels on bed rock has already been considered in connection with the report of the metallurgical chemist, Gustave Beraud, set forth in extenso above. This "muck," so called, is in a frozen state through its entire depth, except during a very short time in the summer months, when it thaws at and just below the surface. Various theories have been advanced as to the original formation of the country as it now is and the order in which the various strata of the material were spread upon and over the bed rock. The generally accepted theory is that the gravel with its treasure was first deposited, and that, at some period after the gold had been laid down, the influx of the material known as "muck" occurred;

3 A.R.—34 .

that this material, when first deposited over the gravels, was in a more or less fluid state; that in such state it would not retain the gold within itself, had the gold come down upon it or into it at that time, but must, because of the specific gravity of the mineral, have deposited it upon the gravels beneath; that as soon as it was frozen it became impenetrable to gold; and that, consequently, the gold at bed rock was probably deposited before the muck overspread the country, certainly before the frozen period began. This theory is borne out by the conditions now found to exist. Neither gold nor colors of gold are found in the frozen body of the muck, though at and upon the surface of it, where water has flowed or is flowing, colors and fine gold are sometimes found. This obviously found its way there at no distant time, and after the overburden was complete and in its present condition. In other words, this "muck" is not a natural depositary of gold. This overburden may well be called the insulation of Nature's treasury, not the treasury itself. Between the gold at bed rock, underlying this insulation, and the particles of gold, in after ages, the forces of nature may have torn from the hillsides and washed down upon the top of the muck, there can be no connection, except in this: That gold found upon the surface of this country, as Juntilla found it in the draw, is an evidence that in the adjacent country auriferous deposits are to be found; that in all probability gold in greater or less quantity is to be found upon bed rock somewhere in that valley. It points definitely to nothing else. But it is undoubtedly as indicative of the mineral character of the country as is the finding of a few colors in gravel in a shaft at bed rock.

Now, to return to the question of discovery. The statutes of the United States provide that "all valuable deposits on lands belonging to the United States" are open to exploration and purchase. Section 2319, Rev. St. U. S. (U. S. Comp. St. 1901, p. 1424). It is also provided that:

"No location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located. * * *" Section 2320, Rev. St. U. S. (U. S. Comp. St. 1901, p. 1424).

But what is to constitute a "discovery" is not declared by statute. The duty of defining this term was left to the courts, with the result that a definition originally based upon the discovery of a lode or vein has been developed, largely out of two classes of cases; the first being in the contest between mineral and agricultural claimants, and the second between rival mineral claimants. This definition is stated fully and clearly in the decision of the Secretary of the Interior in Castle v. Womble, 19 Land Dec. 455, 457. The Secretary says:

"After a careful consideration of the subject, it is my opinion that where minerals have been found, and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success in developing a valuable mine, the requirements of the statute have been met. To hold otherwise would tend to make of little avail, if not nugatory, that provision of the law whereby all valuable mineral deposits in lands belonging to the United States * * * are * * * declared to be free and open to exploration and purchase."

"A prudent man," as used in this definition, does not necessarily mean a skilled miner. 1 Lindley, p. 609. In the first class of cases—that is, between the mineral and the agricultural claimant—this rule is more strictly enforced. Upon the mineral claimant is placed the burden of showing that the land which he claims is more valuable for mining than for agricultural purposes. To establish this fact, he must, of course, in some degree prove the value of the ground for mineral, and to do this he must usually rely upon his original discovery. Consequently it is reasonable, in this class of cases, that the rule be strictly enforced, and that a mineral claimant, in order to hold the ground against one claiming it for agricultural purposes, show that he has something more substantial than

a conjecture or hope upon which to base his assertion that the land is valuable for mining.

But where the contest for possession is between rival mineral claimants, the rule respecting discovery is more liberally interpreted. Chrisman v. Miller, 197 U. S. 313, 323, 25 Sup. Ct. 468, 49 L. Ed. 770; 1 Lindley, § 336. It still, however, is a question as to whether the mineral discovered is sufficient to justify the discoverer in going further. But, as has been said in Bonner v. Meikle (C. C.) 82 Fed. 696, 703:

> "It was never intended that the courts should weigh scales to determine the value of the mineral found as between a prior and a subsequent locator of a mining claim on the same lode."

See, also, Shoshone Min. Co. v. Rutter, 87 Fed. 801, 808, 31 C. C. A. 223; 1 Lindley, § 336.

Judge Sawyer's discussion of this question in his instructions to the jury in the case of Jupiter Min. Co. v. Bodie C. M. Co. (C. C.) 11 Fed. 675, has been accepted and approved by the courts as a correct and adequate statement of the law. It is as follows:

> "It is only necessary to discover a genuine mineral vein or lode, whether small or large, rich or poor, * * * within the lines of the claim located, to make a valid location including the vein or lode. It may, and often does, require much time and labor, and great expense, to develop a vein or lode, after discovery and location, sufficiently to determine whether there is a really valuable mine or not, and a location would be necessary, before incurring such expense in developing the vein, to secure to the miner the fruits of his labor and expense in case a rich mine should be developed."

But what of the placer location? Congress, in section 2329, Rev. St. U. S. (U. S. Comp. St. 1901, p. 1432), makes provision for this class of mining claims in the following language:

> "Claims usually called 'placers,' including all forms of deposits excepting veins of quartz or other rock in place, shall be subject to entry and patent under like circumstances and conditions and upon similar proceedings as are provided for vein or lode claims."

Under this section, then, no location of placer ground becomes valid until a discovery has been made within the limits of the claim. But a discovery of what—the vein or lode? No; of placer mineral. And the courts, in testing the sufficiency of the placer discovery, have applied the same rule or definition that had been formulated as a criterion of the adequate lode discovery. But, while the principle involved is the same, it is obvious that the physical conditions surrounding placer deposits are so radically different from those in which the mineral vein or lode exists, and that the form and manner in which the two classes of mineral have been by nature deposited is so unlike, that the rule must require some modification to render justice to the locator of placer ground; and this seems to be particularly true in the placer country in the interior of Alaska. The prospector who discovers a vein or lode has something definite to follow. True, it may pinch out, or a fault may leave him at a blank wall; but, despite these possibilities, when he uncovers the ledge, he can with a reasonable degree of certainty figure on what he cannot see. But is this true of the placer prospector? The very nature of placer deposits renders any such estimate by the prospector in this country impossible, until he has at great expenditure of time and labor actually found the pay streak. A discovery of gold or colors in a shaft, or even on bed rock, when not on the pay streak itself, gives no indication of the location of that much-sought deposit, or of what its value will be when found. Besides that, a pay streak is only a pay streak when the values taken out are in excess of the values put in, in labor, etc., to recover the gold. A placer discovery, in the interior of Alaska, at least, is in almost every instance attended with the utmost uncertainty as to results, unless the rule be that the values must be shown, even where the contest is over prior location.

A line of cases seemingly requiring greater definiteness in the proof of discovery in placer locations has arisen within the

last decade. In these cases, which have grown out of placer locations made upon petroleum lands, the courts have applied to the question of discovery the rule under discussion, but with apparently less liberality than had formerly been granted to the placer discoverer. Of these Chrisman v. Miller, 197 U. S. 313, 25 Sup. Ct. 468, 49 L. Ed. 770, is the leading case. The court, in that case, after a discussion of the definitions given by the courts to the term "discovery," declares that, though the rule is to be liberally exercised in a controversy between mineral claimants, still:

"There must be such a discovery of mineral as gives reasonable evidence of the fact either that there is a vein or lode carrying precious metal, or, if it be claimed as placer ground, that it is valuable for such mining."

This does not, in my opinion, change the general rule as to what constitutes a valid discovery when applied in a contest between a mineral and a nonmineral claimant, but to strictly apply it to rival mineral locations seems a variation from the liberal rule announced. However, a further perusal of the language of the court, and an examination of Act Feb. 11, 1897, c. 216, 29 Stat. 526 (U. S. Comp. St. 1901, p. 1434) discloses the reason for the stricter application. The court continues:

"There is not enough in what he claims to have seen to have justified a prudent man in the expenditure of money and labor in exploitation *for petroleum*. It merely suggested a possibility that the ground contained oil sufficient to make the land *chiefly valuable therefor*."

The statute (Act Feb. 11, 1897, c. 216, supra) under which that case was decided, and which was evidently in the mind of the court at the time, is as follows:

"That any person authorized to enter lands under the mining laws of the United States may enter and obtain patent to lands containing petroleum or other mineral oils, and chiefly valuable therefor,

under the provisions of the law relating to placer mineral claims; Provided, that lands containing such petroleum or other mineral oils which have heretofore been filed upon, claimed or improved as mineral, but not yet patented, may be held and patented under the provisions of this act, the same as if such filing, claim or improvement were subsequent to the date of the passage hereof."

It is to be observed that Congress has required, in locations of lands containing petroleum or other mineral oils, what it has not required in locations on other mineral lands; i. e., that the lands entered under this statute shall be "chiefly valuable" for such oils. This fact, when taken with the different character of the deposit and methods of prospecting for petroleum, seems to differentiate the oil cases, so far as the definition of a discovery is concerned, from those laying down the rule to be applied to the ordinary placer discovery. Thus the definition of discovery, based upon the discovery of a vein or lode and the rule that it shall be liberally applied as between rival mineral claimants, is unchanged when invoked in cases involving contests between locators of placer claims not founded on chapter 216, supra.

And in proving a discovery the locator is not required to demonstrate that the ground located by him will return a profit. This is recognized by Secretary Smith in Castle v. Womble, supra, when, as an additional reason for his opinion as to what should constitute a discovery, he declares:

"For if, as soon as minerals are shown to exist, and at any time during exploration and before returns become remunerative, the lands are subject to other disposition, few would be willing to risk time and capital in the attempt to bring to light and make available the mineral wealth which lies hidden in the bowels of the earth, as Congress obviously must have intended the explorers should have an opportunity to do."

Some courts have held that a discovery was sufficient if the locator, because of what he had discovered, was willing to expend further time and means in following it. But this,

"unless evidenced by actual exploitation, would be a mere mental state, which could not be satisfactorily proved." 1 Lindley on Mines, p. 609. For this reason, the willingness of the locator to expend his time and means as a test of the adequacy of his discovery has been abandoned, and he must now show that his discovery is such that by it he will be justified in further expenditures. Whether or not his discovery satisfies this test is in every case a question of fact, to be determined by the court or jury. Iron Silver Co. v. Mike Starr Co., 143 U. S. 394, 404, 12 Sup. Ct. 543, 36 L. Ed. 201; Lange v. Robinson, 148 Fed. 799, 803, 79 C. C. A. 1; Book v. Justice Mining Co. (C. C.) 58 Fed. 106, 126.

In the case at bar, subsequent developments upon the claim show that a paying mine was at bed rock waiting to be developed; but this fact was unknown both when Juntilla found the gold in the draw and when plaintiffs panned it out from their shaft. So that the court, in determining the question of discovery in this case, must be bound by what was known at the time, and particularly by "the facts which were within the observation of the discoverer and which induced him to locate." 1 Lindley on Mines, p. 609. Judge De Haven, in Lange v. Robinson (9th Circuit) 148 Fed. 799, 803, 79 C. C. A. 1, says upon this subject:

"The question [i. e., discovery] must be decided, not only with reference to the gold actually found within the limits of the claim located, but also in view of its situation with reference to other lands known to contain valuable deposits of placer gold, and whether its rock and soil formation are such as is usually found where these deposits exist in paying quantities. * * *"

Examining the evidence in the light of these statements of the law, what do we find? Juntilla's observation and information as to the existence of gold and the extent and result of the mining operations on Cleary and Pedro creeks, which are in the vicinity of Dome, as to the topography of the country, as to the character of the ground and the conditions ex-

isting on the paying creeks, and as to the location on the creek of the claim where he found the gold, has already been considered. It is unnecessary to recapitulate, further than to say that the location of Dome creek and situs of the particular ground where he found the colors, the surface material, and what was to be seen of the conditions existing there, were, in general, similar, even if not identical, with what he had observed at and knew of Cleary, where paying mines were in operation at the time.

With all this in the prospector's mind, when he finds colors on the surface in that country, is it to be said that before he can make a valid location he must at all hazards go further with his exploration; that he must expend much time and great labor in sinking holes to bed rock, to demonstrate beyond peradventure that there is gold there? Suppose that he should do so, and find only what plaintiffs found in their No. 1 shaft, or on bed rock at the bottom of that shaft. It was upon the few colors found there that they primarily based their location; their notice having been filed the next day after finding the few colors in the shaft. Would his discovery be better established than it is? He would not have found the pay streak. If such is the requirement of the law for this country, then only the prospector with substantial financial backing would be warranted in prospecting at all. In justice to the Alaskan prospector who depends upon his own efforts and labor alone, such a rule ought not to be established. In Book v. Justice Min. Co., supra, at page 125 of 58 Fed., Judge Hawley describes what, in his view, is an extreme case of rival quartz locations. He says:

"Can it reasonably be claimed under the provisions of the mining laws that a person making a discovery—a discovery which in good faith induces him to locate the vein or lode and to commence the running of a tunnel into the hill or mountain for the purpose of properly working or developing the ground and complying with all the provisions of the law, after he has expended thousands of dollars in

labor and improvements on the same—can be deprived of his location by the fact that other persons, subsequent to his discovery and to his location, went upon the hill 500 or 1,000 feet distant from the place where he had found and prospected the lode, but within the limits of his location, and there by sinking a deeper shaft upon the same lode found ore which assayed over $40 per ton, enough to insure a profit to the owners, and thereupon located the ground? * * * The act of Congress is not susceptible of any such construction. It does not impose any conditions as to the value or extent of the ore."

The situation as it is stated by Judge Hawley is fairly illustrative of that in the case at bar, if the acts of the discoverer Juntilla are in good faith. But to what extent is his bona fides to be considered in determining the sufficiency of his discovery and the matter of justification? An examination of the books makes it evident that the bona fides of the locator is vital to the validity of his claim. Thus, in the case just cited, stress is laid on the fact that the discovery in good faith induced the prospector to locate and expend large sums for the purpose of properly working or developing the ground and complying with the provisions of the law. In Shoshone Min. Co. v. Rutter, 87 Fed. 801, 807, 31 C. C. A. 223, 229, it is said that:

"These facts [referring to evidence upon the question of discovery] show that the location was made in good faith, and not 'simply upon a conjectural or imaginary existence of a vein or lode,' which cannot be permitted."

See, also, King v. Mining Co., 152 U. S. 222, 227, 14 Sup. Ct. 510, 38 L. Ed. 419; Lange v. Robinson, supra; Erhardt v. Boaro, 113 U. S. 527, 536, 5 Sup. Ct. 560, 28 L. Ed. 1113.

So that after all is said and done, the attitude of the discoverer himself toward the sufficiency of his discovery is a potent factor in the determination of the question as to justification. Obviously these requirements are made to prevent locations based upon fictitious discoveries and attempts by

means of fraud to obtain title to public domain for purposes of speculation. Do the acts of defendants' predecessors square with the question of good faith? Juntilla, upon finding gold in the draw, goes back to Cleary and informs Burke of what he found. They enter into a contract with regard to the ground, and get a friend to put the contract in writing. The contract is signed, as already described, and Juntilla files his duplicate for record. Burke goes "outside." In December, after the snow comes, Juntilla, pursuant to his agreement, goes to Dome creek, chops out the lines, and builds a log cabin on the claim. The brushing out of the lines and the construction of the cabin certainly satisfied the assessment work for that year. These acts are undoubted evidences of good faith, for a rational man does not expend time and labor in the construction of a cabin on a claim located on an undeveloped creek in the interior of Alaska, in the middle of winter, for the mere pleasure of the physical effort, or to pass the time, nor on a mere speculation. The circumstances and conditions surrounding this act of Juntilla dispel any such idea. He must have had a purpose in doing this work. The evidence, in my opinion, discloses the purpose. It was to carry out in good faith his agreement with Burke, and by building on the claim a place in which to live to prepare for further work and development there.

Having completed the cabin, he went to Cleary, and did not return, save in February, to get his tools, until about the 1st of April, when he brought a man with him. It is urged that his absence from the claim during all this time, from January 7th to April 1st, is an evidence of bad faith, and that, even if prior to that time he ever had any notion of working the claim, he must by his long absence be deemed to have abandoned it. The law does not contemplate that a locator shall reside continuously upon a mining claim. The requirement of the law (section 2324, Rev. St. U. S.) is that, having made a valid location, the locator shall annually, until patent

issues, expend "not less than $100 in labor and improvements" on the ground. He need do nothing more to satisfy the statute. But even plaintiffs were not continuously upon the ground after making their location, the cold weather and the necessity for replenishing supplies took them away for various periods. There is nothing in this absence, when considered in connection with the other circumstances and conditions existent at the time, from which to conclude that Juntilla was without good faith, or that he had abandoned the ground.

When he returned on April 1st, he found the plaintiffs in possession of his cabin and digging a shaft on the claim. Possession was refused him. Everything about the plaintiffs' occupation of the cabin and the ground, the paraphernalia, which included a boiler and other appliances with which they were at work, indicated that they intended to hold and develop the claim, and that they had the financial ability to carry out the intention. With such a condition staring him in the face, it is not surprising that he offered to sell the cabin to them, and that he made a like offer to others at and shortly after this time, when he found himself dispossessed and prevented from carrying out his agreement with Burke. He was alone. Burke was where he could not reach him at the time. The aspect was, to say the least, not encouraging. But, so soon as Burke returned, they went over the situation together and made a new agreement, which was subsequently reduced to writing. This further agreement concerning the ground is tantamount to a waiver of Juntilla's failure to carry out the first agreement, and a recognition of the fact that such failure was due to the acts of others. As soon as possible, a part of the ground was leased to defendants. Nothing in these acts of Juntilla and Burke, when considered together and as a whole, supports the plaintiffs' claim of bad faith on the part of Burke and Juntilla, or that they had abandoned the claim. On the contrary, I am satisfied that Juntilla, induced by the colors.

which he found and the conditions existent at the time he found the colors in the draw, in good faith expended his time and labor in work upon the claim, in the expectation of finding pay on bed rock. That discovery was the incentive for his work, as was the finding of colors in plaintiffs' No. 1 shaft the incentive for their further work. There was no more certainty to be gathered from the one than from the other. But, as was said by Judge Dewitt, in the dissenting opinion in Shreve v. Copper Bell, 11 Mont. 309, 343, 28 Pac. 315, 323:

"A prospect not once in one hundred times is a mine at sight. If the locator must show a paying mine at location, the riches of these mountains are a locked treasury. The law does not contemplate this."

The situation of the ground with respect to producing creeks, its location in Dome valley, and the character of the material at the surface were sufficient to justify Ridenour and Cook, who were skilled miners, without even prospecting the surface to ascertain what, if anything, was to be found there, to spend money and time in sinking plaintiffs' shafts. Surely, with the added evidence afforded by the gold actually found by him, these facts are sufficient to have justified Juntilla. In my opinion, the defendants have established a discovery that, in an action of this kind, meets the requirements of the definition of discovery as laid down by the courts.

It follows, therefore, that Burke's location was perfected and took effect as of that date (August 27, 1904) when Juntilla made the discovery, and that the ground within the limits of that claim was not thereafter open and unappropriated land of the United States, subject to entry and location. 1 Lindley (2d Ed.) p. 603, § 335; Johanson v. White, 160 Fed. 901, 88 C. C. A. 83. Plaintiffs were trespassers when they made their entry. It was not essential that the owners of the claim should be in the actual foot'possession of the ground to enable them to hold it against entry by others. The evidence of their posses-

sion, stakes, notice, brushed-out lines, and cabin were there. That no one was upon the ground to oppose plaintiffs' entrance, and that, consequently, they took possession of the ground and cabin without physical opposition by the owners, makes their entry none the less wrongful. Cosmos Co. v. Gray Eagle Co., 112 Fed. 4, 18, 50 C. C. A. 79, 61 L. R. A. 230.

The entry of plaintiffs having been initiated in trespass, upon ground already appropriated by a prior valid mineral location, their subsequent acts cannot avail them in establishing a right to the possession of the ground. It follows that they have not such a title as will enable them to succeed in this action. Holding this view of the case, it is unnecessary to extend this decision to greater length in a consideration of the other questions arising from their acts, other than to say that, had the entry of plaintiffs been upon the open, unoccupied, and unappropriated public domain of the United States, their rights to the ground entered would have been established as against subsequent attempts to locate. However, as the ground upon which they entered was already appropriated, they could not make a valid location thereon.

I have read with much interest the pictures painted by the facile pens of the respective counsel for plaintiffs and defendants, in their briefs, of the dire consequences which will result from a finding in this case against their respective theories of what is or should be the law of discovery, and I deem it proper at the close of this decision to remind counsel that while, in order to determine whether a valid discovery has been made, it is not necessary to define the term (Iron Silver Co. v. Cheesman, 116 U. S. 529, 536, 6 Sup. Ct. 481, 29 L. Ed. 712), the ultimate question as to whether a valid discovery has been made in a particular case is always one of fact. The acts and conditions upon which men may in the future seek to predicate a discovery of gold will undoubtedly differ in each case; but the definition of the term "discovery" has long been

settled law, and it may be depended upon to stand for yet awhile. Consequently I feel that both counsel and myself may feel reassured, and that, unless human nature changes in the future from what it has been in the past, there is still hope for the development of the mineral resources of Alaska, whatever may be the ultimate determination of this action.

Judgment for defendants.